Statement of the Case.
MONROE, J.
Plaintiff brought suit against the New Orleans City Railroad Company and the New Orleans & Carrollton Railroad, Light & Power Company for the recovery of damages for personal injury alleged to have been sustained by him whilst traveling as a passenger in a car belonging to the company last named, and as a result of a collision between that car and a car belonging to the other company. There was a motion for severance, which was granted. The ease as to the New Orleans City Railroad Company was tried without a jury, and the matter 'comes before this court on an appeal taken by the defendant company from a judgment' against it for $4,000.
The facts as they appear from the record are as follows:
Between 12 and 1 o’clock on the morning of November 21, 1901, the plaintiff took a Jackson avenue car for the purpose of going home. When the ear reached Prytania street, the motoneer stopped it before attempting to cross defendant’s double track railway which is laid upon that street, and then, seeing a Prytania street car approaching from uptown, but at such a distance that it might under ordinary conditions have been stopped in time to avoid a collision, he started to cross the Prytania street tracks. Before this had been accomplished, however, he realized that the approaching car was moving at very high speed, that no effort was being made to stop it, and that he was in danger of being run into. He thereupon applied all the power at his command with a view of getting out of the way, but was unsuccessful, and his car *800 was struck by the other, at a point near the rear end, with such violence that it was turned almost end for end, whilst the colliding ear was derailed, and finally stopped against or near a post at the lower river corner of Jackson avenue and Prytania street. There were several passengers in the ear with the plaintiff, and most, if not all, of them were injured. The ’accident resulted from the failure of the motoneer of the Prytania street car to apply his brakes, which in turn was attributable to the fact that he and the conductor had had 40 minutes off just before starting on their downtown trip, and had utilized the time by getting themselves under the influence of liquor, and, having started four minutes late, were running the car at very high speed, probably with a view of making up the lost time, but otherwise without regard to consequences. In this connection it may be said that the defendant’s superintendent, interrogated upon the subject, testified that the motoneer had been employed by the company for more than a year, that the conductor had been previously employed, and, having resigned, had been re-employed, and that both men had good records. It also appears that when they were assigned to duty on the night of the accident they were in fit condition, and that the watchman at the station, who was the only person who seems to have observed them when, late at night, they started out on the trip in question, did not discover that they were then unfit for duty.
Returning to the plaintiff: He was seated in the Jackson avenue ear when the Prytania street car ran into it, and as a result of the collision was thrown from his seat, momentarily dazed, and sustained injuries which will be mentioned a little later. After the accident he got on his feet, and went into a drug store at the corner to get some liniment, but failed to get it. He then waited until the car in which he had been riding was replaced on the track, but was unable in the meanwhile to render any assistance, though requested to do so, to other passengers who had been injured.
When the car was ready to resume its journey he got in, and was carried to his original destination, a distance of some six or seven squares, from which point he attempted to reach his home, about a square and a half away, by holding on with both hands to the houses along the banquette. He was accompanied by a neighbor who had been in the car with him, and who had also sustained some injury, and they testify that two sailors, seeing that they were disabled, came to their assistance and helped them to get home. The plaintiff, upon reaching home, went to bed, and had his wife rub him with liniment which they had in the house, and at about G o’clock she went after the doctor, but did not find him, and he did not get there until the next morning, when he examined the plaintiff, and gives the result as follows:
“He had, in the first place, as the most apparent injuries, some severe bruises. He was bruised over the left side of the face; a bicuspid tooth was knocked out; the left shoulder and left arm were severely bruised; there were some severe bruises of the lower left side, over the left costal regions; and the left hip was considerably bruised and painful. All these injuries as an immediate result. Besides, at that time, there was evidence of injury to the spinal column — to a considerable portion of the spinal column— which showed some tenderness, extending in the cervical regions from the lower part of the neck to the lower lumbar regions of the spinal column.”
These injuries, the doctor testifies, were very painful at the time, and continued to be more or less painful. He also testifies that some three weeks later there was developed a paralysis, both sensory and motor, “of the left arm and part of the left thigh, and also of the right lower limb, which is” (speaking as of the date of the trial) “almost complete as to motion and as to sensation.” He further testifies that “the general symptoms indicated concussion of the spinal column, which has, later, resulted in a congestion, and” (as he believes) “inflammation of the. spinal marrow”; and that the plaintiff also appeared to have been severely bruised in the abdomen, which showed great tenderness, and that there is at times a looseness of the bowels, and symptoms of a dysentery condition, the passing of slime and blood, which has continued from the beginning, off and on, until now.
Being asked whether the plaintiff’s injuries are permanent, he replies: “I could not answer positively that they will be permanent, *802 but, in my firm conviction, the great probability is that they will be permanent. I should not have said absolutely permanent, but they will be more or less permanent. I know positively there will be, at the very best that can be expected, a lower nerve tone, or lack of nerve tone or nerve strength. There will be a weaker muscular condition, and there will be a strong liability to the return of this paralytic condition at any time, for different causes, or perhaps without apparent cause, and the paralysis might be, in spite of the treatment, permanent. I won’t swear positively that it will be permanent.”
This witness is a graduate of the Medical College of the University of Louisiana, and has been practicing his profession for over 22 years. He is the regular physician of the Screwmen’s and of the Longshoremen’s Associations, of which the plaintiff is a member, and in that capacity had attended the plaintiff and his family for over five years before the accident, and he continued to attend him regularly from the date of his first visit after the accident until the day of the trial in the lower court. Being asked as to the plaintiff’s condition, before the accident, he answers: “Well, as his physician, I always considered him a man in a very sound condition and in very good health. He was an active, strapping young man.” And the witness indignantly denies that it is possible that the injuries of which the plaintiff complains exist only in his imagination.
The present coroner of the parish, and a former assistant coroner, both physicians in good standing, examined the plaintiff after the trial had begun, and they are of opinion that his injuries are genuine, and possibly permanent. The coroner states, and he is corroborated by the other witness: “I found, from the shoulder to almost the tip of the fingers, evidencing paralysis. I did notice, however, that he could make use of the tips of his fingers, but the arm itself he seemed to have little use of. I even suspected that it might be feigned, and, in order that I might not be in error about it, I made him shut his eyes, and struck a match and burned his arm, without any response. I then pricked his arm, caused the pin to remain imbedded in the tissues, and he evidenced no symptoms of feeling.”
He also testifies that he found, by measure'ment, that the plaintiff’s arm and left chest are smaller, by half or three-quarters of an inch, than the right, that there is a partial paralysis of the right leg, and a slight abnormal curvature of the spine, evidently resulting from spinal injury.
Two other physicians testified on behalf of the plaintiff, and, .though they are not experts in the treatment of diseases of the nervous system, they appear to have entertained no doubt as to the reality of the condition of which he complains.
•It is undisputed that the plaintiff, before the accident, was an “active, strapping-young man,” about 30 years of age, who, as a member of the Screwmen’s and of the Longshoremen’s Associations, and as foreman for the agents of a line of steamships running to this port, was capable of earning, and was earning, $5 a day, or not less than ?90, and from that to $160, per month. He was also a member of a temperance lodge. And, as there is nothing to the contrary in the record, we conclude that he was a healthy, sober, honest, and industrious laboring man.
The house surgeon of the Charity Hospital,, called as a witness for the defendant, gives, testimony from which we make the following excerpts. After stating that he examined the plaintiff at the request of the defendant’s counsel, he says:
“In my opinion, Mr. Patterson is suffering from what is known as traumatic hysteria,, and that has provoked a great deal of litigation for years under the name of ‘railway-spine.’ It is purely the result of suggestion.. In large hospitals you never see that condition. It is only found in patients treated at home, and where the social conditions and) surroundings are contributory. It is not connected with any injury, direct, to the spine, nor is any lesion the cause. It is just simply the shock that occurs, and upon which follow the suggestions and its local exhibitions. The condition is one looked upon by the outside public as of a very serious nature, when, in truth, it is purely psychical. Now, in this instance of this man, you have first the injury, then you have the symptoms of substitution; in other words, the idea of injury is impressed upon the mind; following upon that injury, you have substitution of the injury itself. In this instance, he has *804 arm trouble, which followed two months after the injury. He is incapable of moving his left arm and his right leg, which he thinks is” (are) “paralyzed. There is no injury which would cause a-left arm paralysis and a right leg paralysis that would come 'on in the manner in which the symptoms are given. Then, too, the condition did not occur until two months afterwards, showing it was purely the result of suggestion. There are occasionally contributory influences, for instance, the desire to receive some recompense for the injury. Q. He claims that his left arm and right leg are paralyzed, Doctor; did you find them so? A. I did not; it is only imaginary. Q. Do you find any physical injury existing in him now? A. I do not. Q. How long did you examine him, Doctor? A. Well, I saw him twice, that is, I went to his house, had an engagement with ■ his physician, and his physician failed to meet me there, and, whilst waiting, I casually looked him over, and afterwards his physician came to my office and brought him, and I stripped him and examined him. Q. Would it be usual for paralysis to follow as long as three or four weeks after an accident of that kind? A. Well, if there was a great deal of injury it might; that is, a great deal of bony lesion of the spinal column. There might, in three or four weeks after the injury, follow some paralysis from X>ressure. The bones uniting throw out a superabundance of bone, and that, for a time, might produce some paralysis. That is x>ossible, but it rarely occurs; that is, an injury sufficient to do that is an injury which docs great violence to the spinal cord, and is associated with marked paralysis before this can be produced. Q. Did you find a curvature of the spine, Doctor? A. No, sir; nothing more than usual. Q. You find, then, no physical injury whatever? A. No, sir.”
Gross-examination:
“Q. Doctor, did you apply any test to his arm or his legs? A. Yes, sir. Q. Stick him with a needle or burn him? A. No, sir. I tried him with reflexes. He is perfect in both legs. Q. Is not the manner of applying a flame a severe test? A. In this instance it is not actually a test. * * * Q. Doctor, suppose Mr. Patterson stood before you with his eyes closed, and I walked behind him with a lighted match and applied it to his arms, and he did not know it, and did not move, would not that be an indication of paralysis? A. No, not in his condition. * * * Q. We have a great deal of testimony, Doctor, on the subject — that this curvature is very apparent — might it not have escaped your attention? A. I don’t think so. There is no abnormal curvature there. I want to be fair, now, in my statement. I don’t mean to prejudice his interest, because I really believe that the man is not responsible for his condition, and I repeat, again, his condition is purely imaginary. Q. You say a man in his condition is suffering with ‘railway spine’? A. Yes, sir. Q. That is the result of railroad accident? A. In a majority of cases. Q. Does it impair his mental capacity? A. No, sir. Q. Is he laboring under a mental delusion? A. It is a sort of hypnotic state. Q. (by defendant’s counsel) What do you mean, Doctor? A. Well, if a man is taken home after an accident of that kind, his friends suggest a great many things that might have resulted from the accident, and these become part of his thoughts, and are given expression in local conditions. That is the difference between home treatment and hospital treatment, in these cases. Q. (by counsel for plaintiff) You are partial to hospital treatment? A. Yes, sir. That is the consensus of opinion in these cases. * * * Q. (by counsel for defendant) Doctor, you spoke about the reflexes being in perfect condition; will you state what that means? A. The brain is the controlling, or inhibitory, center. Its controlling influence is upon the spinal cord. The spine carries on a reflex effect when acting independently; in other words, your hand being struck without your knowing it, you quickly draw it back; but if you have your mind on it, you would not — not when your brain inhibits the act. Q. In other words, when the spine is not controlled by the brain, the spine is normal? A. Yes, sir; that shows both motor and sensory connection. Q. (by counsel for I>laintiff) Doctor, is not a severe shock, received in a railroad accident, a permanent injury to the nervous system itself? A. Well, it is possible that it may be, and it is possible that it may not be. Q. Aren’t there a great many cases where people have been mixed up in railroad accidents that never regain their actual force? A. Much depends *806 on the injury. " Q. Say a very severe, unexpected. shock, for instance? A. You see, we are going into a problematical condition. It is barely possible. The nervous system is highly organized, but the spinal eord is protected by a strong bony framework. It is possible that a violent jar of the spine might not be followed by any evidence of the symptoms at the time, and may lay the groundwork for chronic symptoms afterwards. Q. Do you remember reading of the accident that occurred at the corner of Jackson and Prytania? A. I read it in a casual way. I do remember something of that kind. Q. I will refresh your memory. The Prytania car struck the Jackson car with such force as to turn it completely around, and this man was a passenger in the Jackson car. Now, would that be a very severe blow? A. Yes, sir. Q. Now that, of itself, to a passenger in the car, would be a very severe shock, would it not? A. It might be a very severe shock. Q. It would take this man a longtime to get over that, would it not? A. It ■depends upon the man, and it depends upon the nature of the injury, how he was struck.”
The physician regularly employed by the defendant testifies that he called on the plaintiff on the day after the accident and found him lying in bed, with his clothes on; that the plaintiff declined to permit himself to be examined, and that he left his card, as a matter of courtesy to the attending physician, and came away, and that subsequently, in March, 1902, he examined the plaintiff, and, whilst doing so, stuck him in the left arm with a pin, far enough to bring blood, and that the plaintiff jerked his arm away. He also testifies that there was no apparent waste of tissue, and that he found no objective" symptoms of injury. His examination proceeds as follows:
“Q. Did you ever tell him, in the presence of other people, that he had had a severe shaking up ? A. Possibly. There is no doubt that he had a shaking up, being in the car. Q. Is not that an injury? A. No, a man might be shaken up without being injured. Q. Could not the nerve force be vitally injured by a shock of that character? A. Men have been frightened to death. Q. That is an injury, is it not? A. In a certain way, nothing to discover, but from an autopsy, why they should die. I don’t say 'that Mr. Patterson was not frightened or shaken up, but I did not discover any organic lesion, or change in the tissues of his body. Q. You say that you saw a curvature? A. Yes, sir, but it was perfectly normal. * * * Q. (by counsel for defendant) In regard to the mental condition that you speak of, you say you found no physical change? A. No, sir. Q. Does the truth of that condition depend entirely upon the patient’s veracity? A. That is a difficult.thing to answer, because, if you take a hypochondriac, he believes that he cannot move when he can move. Q. I mean this, Doctor: It has been stated, on one side, that the man’s arm is in a bad condition, and, on the other side, it has been stated that it is in perfect condition. A. No way to tell. There is no physical examination or diagnosis that can prove it. Q. In this condition, of ‘railway spine,’ or ‘litigious symptoms,’ can you tell whether the plaintiff is doing it on purpose or not? A. No. You can have an opinion, but there is no medical diagnosis that will establish it. Q. Then you define it to be a condition in which there is no physical way of telling why a patient should not move his -arm? A. No, sir.”
The plaintiff denies that he refused to allow the witness whose testimony has been quoted to examine him on the day after the accident, and testifies, without contradiction, that he was examined upon that day by his own physician, and also by a physician representing the railway company in whose car he was injured, and it does not appear that he made any objection then or at any other time to being examined. He also testifies that he can feel the sticking of a pin in his left arm if it penetrates as much as a quarter, or perhaps an eighth, of an inch, but that he is unable to raise his arm over his head, though, as it appears, he can raise it as high as his head, and that he has no sensation upon the surface of his arm or hand, except perhaps in the tips of his fingers. He also testifies that he suffers pain in both his arm and his leg, and that he walks with great difficulty and in great pain.
Opinion.
That the defendant is liable for the actual injury sustained by the plaintiff is not seriously disputed. The two propositions presented oh the appeal are (1) that tire in *808 juries complained of are imaginary, and (2) that punitory damages have been improperly awarded.
It seems, from the testimony, that the only reason that the medical experts examined in behalf of the defendant have for denying that the physical condition of the plaintiff is such as he and the medical experts examined on his behalf believe and describe it to be is that they have found, or have failed to And, certain “objective” symptoms, and yet, as we understand their testimony, they admit that the condition may nevertheless exist. The distinguished house surgeon of the Charity Hospital appears to have attached considerable importance to the supposed fact that there was - no indication of paralysis for two months after the accident. But in this he was in error, as it is shown, without contradiction, that the paralysis appeared within three weeks, and he himself admits that “a violent jar of the spine might not be followed by any evidence of the symptoms at the time, and may lay the ground for-' a chronic condition afterwards,” whilst the defendant’s regular physician states very frankly that, whilst one may have an opinion upon the subject, there is no medical diagnosis that will establish the existence of the “railway spine” with which the defendant is endeavoring to provide the plaintiff. The sum and substance of the expert testimony for the defense upon this subject is that a person, showing or failing to show, the symptoms which the defendant’s witnesses have found, or have failed to And, in their examinations of the plaintiff, may either honestly believe that he is suffering from injuries which have'no physical existence, or he may be merely shamming, for the purpose of obtaining money to which he is not entitled, or he may be really in the condition in which he and the experts examined in his behalf swear that he is. It seems to be conceded, however, that the plaintiff is not shamming, as no witness has expressed that opinion, and the defendant's leading expert says, “I really believe that the man is not responsible for his condition.” We have therefore to choose between the alternatives of holding that the plaintiff is actually suffering from the physical disability of which he complains, or of holding that, by reason of a mental condition for which he is not responsible, he believes that he is suffering from that disability, and as a consequence, for all practical purposes, is in the condition in which he believes himself to be. But we are not assured that he is any more likely to get well in tkeo one' case than in the-other, and as, in either case, it is the defendant who is responsible for his condition, it is not clear that it makes any difference, so far as the claim here made is concerned, which alternative is chosen. There are, however, certain uncontroverted facts which, to-the lay mind, indicate that the plaintiff’s injuries and their results are not the mere figments of a morbid imagination. He was, up-to the moment of the accident, a healthy, robust young man, who earned high wages because of his capacity to do the hardest kind of physical work, and who is not shown to-have been gifted with any imagination, whether morbid or otherwise. In a moment, after the terrific crash, as a result of which the car in which he was riding was knocked completely around, he was insensible, and severely bruised, shocked, and jarred. We-know that he was unable to respond to a request to assist other passengers who were-injured, from which, considering his personality, it might fairly be inferred that his-own injuries were more than skin deep. And we know that shortly afterwards, when he got out of the car and attempted to make his way home, he was obliged to support himself by holding on with both hands to the houses along the banquette, until some one came to his assistance. And we further know that, at or before daylight, his wife went after their family physician, who (though he came only on the following morning) found the plaintiff, in his (the doctor’s) opinion, a badly injured man, whom it was necessary to keep in 'bed. Conduct of this kind does not appear to-us to be natural to a strong young laboring man who is suffering from no physical disability, and it cannot reasonably be argued that he had become the victim of hypnotic suggestion, or home influence, before he reached home, or within so short a time afterwards. We take it, therefore, that he had sustained some internal injury, the exact nature and extent of which can only be arrived at by deduction, from objective symptoms, or from an autopsy, and as the latter method is impracticable, under present con *810 ditions, we are compelled to rely upon the former. The medical experts who have testified disagree as to the symptoms which the ■case exhibits, and there is this further difference between them, viz., those who have testified on behalf of plaintiff, including his family physician, who has attended him for years, and who has had charge of this particular case from the beginning, find that his physical symptoms bear a proper relation to the paralysis with which they believe him to be suffering, whilst those who have testified on behalf of the defendant, although they .attribute the plaintiff’s supposed paralysis to his imagination, nevertheless virtually admit the possibility of its being the result, not only of physical causes, but of the particular ■shock received by him whilst a passenger on the defendant’s railway. Under these circumstances, and in view of the undisputed fact that a laboring man, the embodiment •of youth, health, and strength, has suddenly been reduced to such a condition that he can barely drag himself around, we are of opinion that something more definite than has been here presented would be required to justify us in adopting the theory of “suggestion” as a substitute for the more natural explanation of “physical injury” which has been offered, and this the more particularly as the “physical injury” has been vouched for by direct, affirmative evidence, whilst the “suggestion” remains a theory, arrived nt by reasoning from analogy — -at best an uncertain process.
The defendant complains that the judge a ■quo improperly allowed punitory damages, and asks that the amount allowed be reduced ■on that account. The plaintiff, on the other hand, has answered the appeal, and prays that the amount allowed him be increased to $25,000.
The judge a quo, after an able review of the ease, concludes his reasons for judgment as follows: “The defendant company must recompense the plaintiff for the damages sustained by him through pain and suffering and loss of salary, past and future, and it must also pay as a warning to itself, hereafter, and to others.” And he then proceeds to render judgment for a lump sum of $4,000.
Whether it was intended that the whole judgment should operate as a warning to the defendant, or whether the learned judge included in his judgment an amount for that purpose which he would not otherwise have included, is not altogether clear. The case is not one calling for the infliction of punitory damages. The actual wrongdoers, that is to say, the conductor and the motoneer of the Prytania street car, were proceeded against criminally, and were probably punished if a case was made out against them. There is no sufficient reason for extending the punishment to the defendant,"who is only consequentially liable for the acts of its agents. Hill v. New Orleans, O. & G. W. Ry. Co., 11 La. Ann. 294; Keene v. Lizardi, 8 La. 33; Graham v. Street Railway Co., 47 La. Ann. 1656, 18 South. 707, 49 Am. St. Rep. 436. Upon the other hand, we are of opinion that the amount allowed is not more than should have been allowed as compensatory damages, and, whilst it will not be increased, it will not be reduced.
Judgment affirmed.