(74 South. 541)

No. 22182.

VINCENT et ux. v. MORGAN'S LOUISIANA & T. R. & S. S. CO.

(Feb. 12, 1917. Rehearing Denied March 12, 1917.)

*(Syllabus by the Court.)*

1. MASTER AND SERVANT ☞300—INJURY TO THIRD PERSON—SCOPE OF EMPLOYMENT.

The master is liable in damages for any negligent or wanton act of his servant whereby another sustains injury in his mind, body, or estate, and which is committed in connection with or furtherance of the purposes of the servant's employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1209.]

2. DEATH ☞31(1), 81, 93—RIGHT OF ACTION —DEVOLUTION—STATUTES.

Under our law as it now stands, the right of action for the recovery of damages for personal injury sustained through the fault of another is personal to the injured party so long as he survives, and, unless previously exercised by him, devolves at his death upon the persons specified in article 2315 of the Civil Code (as amended and re-enacted by Act No. 120 of 1908) ; and, should he die in consequence of an injury without having exercised his right, they acquire also a right of action in damages for injury they may sustain by reason of his death, and are entitled to full indemnity with respect thereto ; but neither the person originally injured nor those who succeed to his rights with respect to the injury, and who acquire rights of their own with respect to the injury inflicted upon them by his death, are entitled to recover anything more in the way of damages than adequate indemnity for the injury and loss inflicted upon him and them in mind, body, or estate, there being no provision in our system of laws which authorizes the cumulation in such cases of a civil action for the redress of a private wrong with a quasi criminal prosecution for the assumed benefit of the public, but the sole purpose and principal effect of which is to increase the adequate indemnity recovered by the plaintiff as actual and compensatory damages by the addition of a pecuniary penalty in the form of exemplary, punitive, or vindictive damages.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 35, 46, 98, 103–105.]

3. APPEAL AND ERROR ☞1013—DISCRETION OF TRIAL COURT—DAMAGES—STATUTE.

An action in damages by both parents for the death of their son, aged 16 years, under circumstances which render a railroad company liable therefor, where the ground of action is the injury to their feelings and loss of their son's society and affection, belongs to a class with reference to which our law (Civ. Code, art. 1934) specifically declares that in the assessment of damages much discretion must be left to the judge or jury. Unless, therefore, this court is satisfied that the discretion so vested has been abused, the assessment of damages, as made by the judge or jury in such case, will be left undisturbed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3993–3995.]

4. DEATH ☞99(5)—DAMAGES—AMOUNT.

This court having established precedents for allowing $5,000 to one parent for the loss of the society and affection of a child, the allowance in such case of $10,000 to both parents is not an abuse of the discretion vested in the trial judge.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125, 126, 130.]

Appeal from Twenty-Eighth Judicial District Court, Parish of Jefferson; John E. Fleury, Judge.

Action by James H. Vincent and wife against the Morgan's Louisiana & Texas Railroad & Steamship Company. Judgment for plaintiffs, and defendant appeals and plaintiffs, answering the appeal, pray that the amount of the award be increased from $10,000 to $20,000. Affirmed.

Robert H. Marr, Alfred E. Billings, and Denegre, Leovy & Chaffe, all of New Orleans, for appellant. William H. Byrnes, Jr., and Prentice E. Edrington, Jr., both of New Orleans, for appellees.

Statement of the Case.

MONROE, C. J. This is an action by the parents of a boy for the recovery of damages for his alleged wanton killing by one of defendant's employés, while acting in the discharge of the functions for which he was employed. The case was tried without a jury, and resulted in a judgment for plaintiffs in the sum of $10,000. Defendant has appealed, and plaintiff has answered pray-

ing that the amount of the award be increased to $20,000. The facts, as we find them, disclosed by the evidence, are as follows:

On the evening of February 12, 1915, at about 8 o'clock, Edward Friloux, employed by defendant to watch its property and protect it from trespassers and thieves, was traveling on one of defendant's freight trains, and had in his custody three hoboes, who had been arrested and turned over to him and whom it was his purpose to lodge in the parish jail at Avondale. The train was a long one, and he and his prisoners were seated on cross-ties constituting the load of a gondola which was about the seventeenth car from the locomotive, the prisoners with their faces towards the locomotive, and he, facing them, with his back to the locomotive, their elevation above the ground being eight or nine feet. At a certain point in Gretna where the railway crosses a public road there were gathered at that time some 15 or 18 boys, aged from 11 to 18 years, including plaintiff's son, aged 16 years, and as the gondola in question reached there and was passing there was some "hollering" and some missiles thrown by the boys, or some of them, at those who were on the gondola, and thereupon Friloux fired a shot from a pistol, which took effect upon plaintiffs' son, and resulted in his death within a few minutes. There is some little conflict in the testimony, but the facts, nevertheless, stand out clearly enough. Ten of the boys were called as witnesses for plaintiffs, and eight of them testify that there was no "hollering," and all of them that they threw no missiles and saw none thrown. Two of them testify affirmatively to the "hollering" as follows:

Joe Russo:

"Well, I heard some boys 'holler,' there was four hoboes, and when the train was going a shot was fired into the boys, and I turned and run behind a tree. * * * Q. Where did the shot come from? A. Come from that flat car (meaning the gondola), and he was on the flat car. Q. Had that flat car passed at the time that shot was fired? A. Yes, sir; passed about 70 feet, or something like that, when he fired."

Frank Allo:

"About 10 or 12 cars from the engine there were three or four fellows on a car, and we all hollered, 'Look at the hoboes on there,' and so soon as we hollered that a fellow fired; I couldn't tell who shot it, or what; I know it was a railroad detective, though. Q. Fired, and then what happened, Frank? A. Well then the boy fell, after he fired."

Friloux, after stating that he was on the car, with the three hoboes, and had reached the point to which we have referred, testifies further (quoting in part):

"Q. What happened there? A. I got hit on the head with a piece of cypress knot. * * * A. What effect did it have when it hit you? A. It knocked me out a little bit, knocking me on my face, and, when I went to raise up, a brick caught me on the arm and another brick caught me in the back. Q. You know who threw those missiles at you? A. No, sir; I don't know; I know there was a gang down there. * * * Q. Did any of them say anything? A. Yes, sir; just as the knot hit me in the head and I fell down, one of them said, 'We've got the son of a b——; let's kill him.' I raised up, and one caught me on the arm and one in the back. I had my gun in my hand, watching those three hoboes I had arrested, and then I raised up and made a shot in the air to scare them. Q. Did you intend to hit anybody? A. No, sir; shot up in the air. * * * Q. How fast was that train going, about? A. Well, I guess about eight or nine miles an hour. I know I could catch it, the way it was running. * * * Q. Was it pretty dark? A. Very dark. * * * Q. Was there any chance for you to get away from those missiles that were being thrown? A. No, sir; the brick was coming too fast, and at the same time the three prisoners were struck, too. One of them was hit in the right side of the head and fell. * * * He was hit with half a brick. * * * Q. What did you say you did with that block that hit you on the head? A. Brought it here and turned it over to the sheriff. * * * Mr. Friloux, how old are you? A. I am 42 years old. * * * Q. How much do you weigh, Mr. Friloux? A. Two hundred and seventeen pounds. * * * Q. You are pretty strong? A. Pretty strong. * * * Q. Now, Mr. Friloux, how far had you passed the bridge, or the public road, where these boys were standing, when you shot? A. Of course, I couldn't tell while the train was going, but just about 25 or 50 feet, at most, just got past there. * * * Q. When you say you shot up in the air, you mean you intended to shoot up in the air, but, as a matter of fact, you did not shoot up in the air? A. I couldn't shoot down. I had to shoot this way

because I was about the middle of the car, and by sitting down I just shot over the heads. Q. As a matter of fact, it didn't go the way you intended it to go did it? A. That I don't know. Q. You do know that a boy was shot and that he was shot with your bullet? A. No, sir; I don't know that he was shot with my bullet. * * * I don't think he was killed with my bullet. * * * Q. What kind of a pistol did you have? A. Forty-one. Q. Would you know your bullet if you saw it? A. I know a 41 when I see it; yes, sir. (The witness is shown a bullet, marked 'XX,' being the bullet that was taken from the body of the boy.) The Witness: It is a 41. * * * Q. How many shots were fired? A. I don't know; I fired one. Q. You fired one? A. Yes; and there were other people heard more. Q. How many did you hear? A. I heard one. * * * Q. Those boys weren't right up against the crossing? A. They were right near. Q. Out near the crossing in the public road? A. About 10 or 15 feet from the train. * * * Q. Now, if you had passed the crossing more than 25 or 50 feet, why did you fire at them? A. Because they said, 'Let's get the son of a b—— and kill him.' Q. With the rumbling of a train of 55 or 60 cars, and after you had passed the crossing, you say you heard somebody in the crowd holler, and that is why you shot? A. Yes, sir. * * * I didn't know if they were going to get on the train and pull me off the train. * * * Q. And, according to your testimony, you shot up in the air, and you don't believe you hit the boy? A. I don't believe I did. * * * I will swear I didn't kill the boy. * * * Q. Now, did you think your life was in danger at the time you fired that shot? * * * A. Yes; I thought my life was in danger; sure; that's why I fired. * * * Q. You were being taken away from the danger, from the crowd, all the time? A. They could have got on the train, though, * * * on the box cars. * * * No; I made a shot just merely to stop them from climbing at me or getting on the train. * * * Q. You say the hoboes couldn't have gotten off the train? You testified to that a few minutes ago. A. Unless they wanted to break their necks by jumping off. Q. That's the only way they could have gotten off, by jumping and breaking their necks? A. Breaking their necks or their legs. * * * Q. Did the company approve of your shooting into a public highway? A. I don't think they approve of my shooting into a public highway, but they approved of me shooting to scare people away. Q. They thought you were justified in doing that? A. They thought I was justified in shooting to protect my life; yes. Q. You are still working for the company? A. Yes. Q. In the same capacity? A. Yes, sir."

There was one witness called for the defense who testified that he heard, or thought he heard, two shots, neither of which he was able to locate, and he then admitted that one of them might have been an echo of the other. The testimony of the other witnesses, including that of Friloux, leaves no doubt that there was but one shot fired, that it was fired by Friloux, and that it killed the boy. Being asked how it happened that the cypress knot was the only missile that he preserved, Friloux replied that the bricks and half bricks by which he and the hoboes were struck passed on over the car after they had performed that function. He does not reconcile his statement, that they would have broken their necks or legs if they had attempted to get off, with his testimony to the effect that he feared that the boys would get *on* the train and another witness called by defendant testifies that, in view of the darkness and the surrounding conditions, the one attempt would have been about as dangerous as the other. Upon his arrival at Avondale witness exhibited the lump on his head and the cypress knot to several persons, but does not appear to have complained that he had been struck by any other missile. The coroner testifies concerning the injury as follows:

"There was some evidence of a little hickey over his eye or his forehead, I think; I don't remember which eye it was; might say just a slight bruise, a little hickey; * * * just an elevation of the cutaneous part. Q. A swelling? A. Yes, sir. Q. Was not his eye bloodshot at that time? A. Not at that time."

Another witness compared the lump to a pigeon's egg; another to a hen's egg; another went so far as to say, in answer to a leading question, that it was as large as his fist. There is some testimony to the effect that one of the hoboes, perhaps two of them, exhibited red spots or bruises, but no suggestion that either Friloux or the hoboes made any attempt to escape the missiles by flattening themselves on the cross-ties, though they were elevated eight or nine feet above the boys, who were on the ground and near the track. Several of plaintiffs' witnesses testified that Friloux had been carried as

much as 70 feet beyond the crossing, and, of course, was still moving away from the boys, when he fired the shot. Of the whole number of boys shown to have been in the crowd, at least five were not called by plaintiffs, and, whilst it may be that those who were called did not participate in the "hollering" and barely possible that, by reason of the darkness, some of them did not see the throwing, we are satisfied that "hollering" was done and missiles thrown by some of the party, though the throwers may have been those who were not called as witnesses. We are equally satisfied that Friloux was subjected to no such danger as justified his firing, as he did, into the crowd, and we are unable to believe that he really apprehended that the boys would get on the train and attack him, which he says was the danger that he feared and which induced him to fire. It does not appear that any of the boys knew him, and it is evident, from the whole testimony, that they believed the persons on the car to be merely hoboes. It is shown that the boys were in the habit of congregating in the evenings and playing upon a "green" which happens to be opposite a barroom, and the fact that they mention the vicinity of the barroom as their rendezvous is placed to their discredit as though they met in the barroom, or chose the "green" because of its proximity to it. It is also placed to their discredit that they refer to themselves as "the gang," but boys of all classes do the same thing, even those of a larger growth and better opportunities. There is no doubt that they did at times get into mischief. They lived along the rights of way of two railroad companies, and they jumped on and off the passing trains. Defendant's counsel proposed to show, as they stated, in cross-examining one of the boys, that they had on previous occasions pelted defendant's trains with missiles, and that on November 14, 1914, Frank Vin-

cent threw a rock or clinker through the window of the caboose of a train, knocking the hat off the head of the conductor. The court sustained an objection to the question on the ground that the throwing was alleged to have occurred six months before the killing of Vincent, and was irrelevant to the issues on trial. It was shown that Vincent and several others had been charged also in November, 1914, with throwing rocks and bricks and breaking the windows of the Texas & Pacific depot at Harvey; that they admitted their guilt, and were discharged with a severe reprimand and upon their promise that they would do better in the future. The justice of peace called as a witness for defendant and asked whether he knew the general reputation of young Vincent replied that he knew his parents to be nice people, but knew nothing about him save from the charge thus above mentioned. There are, however, a number of witnesses who testify that he was a boy of unusually good character. Thus Miss Hanley, principal of the Marrero Grammar School, says:

That he was in the seventh grade, and that he was a "very good boy; nothing to say against him; an excellent student; one of the best helps that a school-teacher could have in the school building. He did not only his duty in the school, but he did his work outside." [Had known him] "from September until his death. He had just left school one week before his death; left school to go to work."

### Opinion.

We have found that plaintiffs' minor son was shot to death on a public highway by one of defendant's employés whilst the latter was engaged in the discharge of the functions for which he was employed, and, according to his uncontradicted testimony, his act has been approved by his superior officers, upon his representation that he shot in the air for the purpose of scaring away persons who were assaulting him and threatening him with death or great bodily harm. As part of the defense an effort was made to

show that at various times prior to the killing the boy, or other boys with whom he associated, had thrown missiles at defendant's trains, though it is not suggested that any one had ever been injured in that way, and that they had committed other mischievous acts. The trial court ruled that the testimony offered was irrelevant, and it was, generally speaking, excluded, but in the cross-examination of one of the boys defendant's counsel elicited testimony to the effect that the witness had never seen the deceased boy throw any such missiles. Conceding, however (for the purposes of the argument), that he or his friends had devoted years to that occupation, neither defendant nor its employé had the right thereafter to take his life on that account. The ruling of the trial judge in excluding the proffered testimony was therefore, correct.

We have found that the decedent and his associates had assembled on a public road, across which there passed at the rate of, say, 9 miles an hour, a train carrying the person who did the shooting, with three "hobo" prisoners in his custody, and that they were seated upon cross-ties, constituting the load of a gondola, and were thus elevated 8 or 9 feet above the ground upon which the boys were assembled, that there was some "hollering" by the boys, and that some of them threw missiles at the party on the car, all of whom they supposed were hoboes. Defendant's employé testifies that they (referring to the boys) said, "Let's get the son of a bitch and kill him," or words to that effect, and (to quote his language), "I did not know if they were going to get on the train and pull me off the train"; and he says that he then, having passed the boys, according to his testimony, by 25 or 50 feet, and, according to other witnesses, 70 feet, and still moving away in his elevated position, fired up in the air, in order to scare the boys, but with no intention of hitting any one. No witness corroborates the testimony so given as to what was said by the boys, and neither the witness who gave that testimony nor any other testifies that the boy who was killed had said or had thrown anything, and the fact that he was standing on the ground eight or nine feet below the person who did the shooting, and was shot in the region of the epigastrium, is conclusive evidence that the shot was not fired up in the air. It is true that defendant's counsel, in some of their questions, suggested the idea that the bullet, fired up in the air, may have been deflected by a tree, but, from our understanding of the relative positions of the boy and the one or two trees that are shown upon a photograph offered in evidence, it would have been necessary for it to have been deflected downward and backward and then forward, in order to have passed, as it did, through the boy from front to rear. On the other hand, the course taken by the bullet through the boy's body was the natural course for it to have taken if fired directly at the boy from the position occupied by the person who did the firing. The evidence utterly fails to satisfy us that there was any necessity for the firing of the pistol, or that Friloux, who fired it, had any reasonable or probable cause for believing, when he fired, that he was in any serious danger of life or limb. The car upon which he was traveling had passed the boys, as he admits, and was still moving, and he does not pretend that he apprehended any further danger from the missiles (which he might easily have avoided by flattening himself upon the cross-ties). He says that he "didn't know if they were going to get on the train" and take him off. He does not say that he observed any indication that they so intended; and he does say that the hoboes whom he had in charge could not have gotten off without breaking their necks or their legs, to which another of defendant's witnesses, who has been in the

railroad service for many years, adds the following testimony (on cross-examination):

"Q. Then isn't it, as a matter of fact, easier to get off a train than it is to get on? A. Yes, sir. Q. And isn't it a fact that in the darkness of the night it is much more difficult to catch the handholds than it is in daylight? A. Yes; certainly."

If we assume that, when Friloux says he fired up in the air, with no intention of hitting any one, he is testifying to what he intended to do, and what he believes he did, the case is improved from a moral point of view, but is little or no better in its legal aspect; for he testifies that he has been accustomed to the use of firearms all of his life, and is a good shot, and his failure to miss (when firing with the intention to miss) a crowd of human beings standing within 25 or 50 or 70 feet, with nothing intervening, would be an exhibition of the grossest conceivable negligence.

[1] That defendant is liable for such damages as plaintiffs are entitled to recover we think there is no doubt. The master is liable in damages for any negligent or wanton act of his servant whereby another sustains injury in his mind, body, or estate, and that is committed in connection with or furtherance of the purposes of his employment. Gann v. Great So. Lumber Co., 131 La. 400, 59 South. 830. Moreover, in this case, knowing what its servant had done, and that his act had resulted in the taking of a human life, the master ratified and approved that act.

[2, 3] The question then is as to the quantum of damages. The boy became unconscious almost immediately after he was shot, by reason of the great loss of blood consequent, as one of the physicians thought, upon the severance of a large artery, and we find nothing upon which to predicate the belief that he experienced any suffering that it would be possible for us to appreciate or measure in money. He is not shown to have contributed anything to the support of his parents, and we have no assurance that he would ever have been able to do so.

In so far, therefore, as plaintiffs' claim for actual and compensatory damages is concerned, it is of the character thus described in the opinion in Bourg v. Brownell-Drews Lumber Co., 120 La. 1027, 45 South. 979, 124 Am. St. Rep. 448, in which the question of the right to recover damages for injury to feelings, loss of society, etc., is fully discussed, to wit:

"Plaintiff's right of recovery therefor rests upon the proposition that he is sorrowing, and will sorrow, for the untimely death of his son, and for the deprivation of his son's society and filial affection, and, exercising the discretion vested in the courts in such cases, we fix the amount to which he is entitled at $5,000."

In the case thus cited the father alone sued, in the exercise of the right of action conferred upon him, and claimed nothing by virtue of the right inherited from his son, who was killed instantly, and nothing by way of punitory damages.

In the instant case, both parents are suing, and they claim punitory in addition to compensatory damages.

" 'Punitive damages,' 'vindictive damages,' and 'exemplary damages,' " say some of the authorities, "are in legal contemplation, synonymous terms. The kind of wrongs to which exemplary damages are applicable are those which, besides the violation of a right, or the actual damages sustained, import insult, fraud, or oppression, and are not merely injuries, but injuries inflicted in a spirit of wanton disregard. On the point of exemplary or vindictive damages, there has been some discussion between law writers, some contending that punitive damages are intended as a personal punishment to the offender; others that the object should rather be a lesson to the public. The better doctrine seems to be that they are usually given as a punishment to the offender, for the benefit of the community, and a restraint to the transgressor. Such damages are only given in cases where malice, fraud, or gross negligence enter into the cause of action; and, in order to warrant their recovery, there must enter into the injury some element of aggravation, some coloring of insult or malice that will take the case out of the ordinary rule of compensation." 31 Cyc. 105.

When, however, we consider that "punitive" damages, thus said to be given for the

benefit of the community, are not given to the community, but are awarded to the individual who sues for them and shows some loss or injury resulting from the fault of another, it becomes evident that the award must be so made because the particular individual discloses a relation to the cause of action which entitles him, rather than some other member of the community, or the community itself, to recover it. The loss or injury resulting from fraud, insult, or slander may be difficult or impossible to prove, and, though the law may provide for the protection of the community in such cases by means of criminal prosecutions, the principal sufferer is the person who is defrauded, insulted, or slandered, and the civil action for the recovery of the damages that he can prove may be inadequate for his relief; and so the common law recognizes punitive damages to be awarded, it is said, for the benefit of the community (already provided with a remedy), but which are given to the principal sufferer, on his petition for relief. For the loss of affection and society and the injury to her feelings which the tort-feasor inflicts upon the mother by the killing wantonly or negligently of her son the common law seems, as also did this court at one time, to have found no action in damages, and punitive damages have not unfrequently been awarded in addition to the damages allowed for pecuniary losses shown to have been sustained, or perhaps more frequently exaggerated damages, as for pecuniary losses, with but little in the way of proof to sustain the judgments. Under our law and present well-settled jurisprudence parents have an action for the recovery of compensatory damages against those by whose fault they lose their children, for the loss of the affection and society which they might otherwise enjoy, and for the grief with which they are thereby stricken, and the difficulty with regard to the proof in such cases is solved by a specific provision of the law to the effect that "much discretion must be left to the judge or jury." On the other hand, there is no provision which authorizes an individual bringing an action for damages to combine therewith a criminal prosecution for the punishment of the defendant in the interest of the community, and there is but little in our jurisprudence which sustains the view that such a combination is permissible; nor is there any good reason why there should be; for, if the law makes adequate provision, in the way of a civil action, for the indemnification of one who has been injured through the fault of another, and adequate provision, in the way of a criminal prosecution, for the protection of the community, there can be no reason why relief should not be sought in each case in the manner thus provided. The law to which we refer is found in C. C. art. 2315 (as re-enacted in Act No. 120 of 1908), and article 1934, and (so far as here applicable) reads as follows:

"Art. 2315. Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; the right of this action shall survive in case of death in favor of the children or widow of the deceased or either of them, and in default of these in favor of the surviving father and mother or either of them. * * *

"Art. 2316. Every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence, or his want of skill.

"Art. 2317. We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications. * * *

"Art. 2320. Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."

The remainder of this article is omitted, as eliminated by construction.

"Art. 1934. Where the object of the contract is anything but the payment of money, the damages due * * * for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:

"1. Where the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. * * *

"2. When the inexecution of the contract has proceeded from fraud or bad faith, the debtor shall not only be liable to such damages as were, or might have been foreseen at the time of making the contract, but also to such as are the immediate and direct consequence of the breach of that contract; *but even when there is fraud, the damages cannot exceed this.*

"3. Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. Where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality or taste, or some convenience or other gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts are objects and examples of this rule.

"In the assessment of damages under this rule, *as well as in cases of offenses, quasi offenses,* and quasi contracts, such discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages * * * as will fully indemnify the creditor whenever the contract has been broken by the fault, negligence, fraud or bad faith of the debtor." (Italics by the writer.)

It will be observed that article 2315 provides that a person through whose fault damage is caused shall "repair it," and that there is no suggestion of any other penalty to be imposed upon him; that article 1934, § 2, after providing for the actual damages to be recovered for the inexecution of a contract in fraud or bad faith, declares, "but, even when there is fraud, the damages cannot exceed this"; and that paragraph 3 of the same article deals, not with any penalty to be exacted for the benefit of the community, but with damages which become "due" to a party to a contract by reason of his being denied some gratification to which the contract entitled him, or because of some offense or quasi offense committed to his prejudice, which damages this court has held time and

again to be compensatory, and not punitive. Brown v. Crockett, 8 La. Ann. 34; Byrne & Co. v. Gardner, 33 La. Ann. 6; Van Amburg v. Railroad Co., 37 La. Ann. 650, 55 Am. Rep. 517; Caspar v. Prosdame, 46 La. Ann. 38, 14 South. 317; Wimbish v. Hamilton, 47 La. Ann. 254, 16 South. 856; Fitzpatrick v. Publishing Co., 48 La. Ann. 1116, 20 South. 173; Sundmaker v. Railroad Co., 106 La. 111, 30 South. 285; Bourg v. Brownell-Drews Lumber Co., 120 La. 1000, 45 South. 972, 124 Am. St. Rep. 448. Nor is that doctrine confined to this jurisdiction. Judge Thompson, in his work on "Negligence," cites many cases decided by other courts in which it is sustained, and himself strongly supports it, saying, among other things:

"But damages on the ground of injury to the feelings are not given in these cases as exemplary damages, but as compensatory damages. * * *" Thompson on Negligence, vol. 2, § 2479.

"A general reading of this chapter will make it clear beyond all question that damages are constantly awarded for the cause of outrage, indignity, and humiliation visited upon a passenger by expelling him from a vehicle of the carrier, although without violence, and although no substantial losses are subsequently entailed upon him as a proximate consequence of the expulsion. If this were not the rule, there would be no right to recover damages for insulting language, or for expelling a passenger in a rude and boisterous manner, or for subjecting a passenger to the nuisance of riding in a coach with drunken passengers. * * * Damages given on the footing of humiliation, mortification, mental suffering, etc., are compensatory, and not exemplary, damages." Id. p. 3288.

In Caspar v. Prosdame, 46 La. Ann. 36, 14 South. 317, it appeared that defendant charged plaintiff with having robbed him, called him a thief, etc., and plaintiff brought the suit for damages. It is said in the opinion:

"The plaintiff claims damages for injury to his feelings and for the humiliation to which he has been subjected. No claim is made for injury to his character or reputation."

And it was held that he was entitled to recover, and that, under C. C. art. 1934, much discretion was left the judge in the assessment of the damages.

Counsel who have from time to time appeared before this court, proceeding, apparently, upon the theory that, where no damages are susceptible of assessment by direct testimony, no actual or compensatory damages could be recovered, have prayed for punitive damages as the supposed and sole alternative, and, as the court in some instances has held that such damages might be awarded, and in others has awarded damages without designating their character, some confusion has arisen, so that in the later cases the right under our system to award such damages is not unfrequently referred to in the subjunctive. Thus, in Rutherford v. Railroad Co., 41 La. Ann. 794, 6 South. 644, it was said:

"The question of the applicability of the doctrine of exemplary damages partaking of the nature of punishment to our system of laws has been the subject of many conflicting opinions in our own jurisprudence. And, while the doctrine, as applied to acts of willful and malicious torts on the part of natural persons is universally recognized in common-law jurisprudence, it has not received unanimous sanction in courts of that system in its application to suits in damages against corporations, and particularly as to railroad companies and other common carriers. The question is discussed at length and with ability by the district judge in this case, and it presents a subject of attractive study. Our own jurisprudence is not yet definitely settled on the question, and it is, perhaps, desirable that it should be, but under our appreciation of the present case we conclude that the occasion has not yet arisen."

In McFee v. Railroad Co., 42 La. Ann. 797, 7 South. 722, it is said:

"If such damages are allowable as such at all under our system, they are allowable only when an element of malice or evil intent, or oppression enters into and forms part of the act."

See, also, Graham v. Street R. Co., 47 La. Ann. 1656, 18 South. 707, 49 Am. St. Rep. 436; Patterson v. N. O. & C. Light & Power Co., 110 La. 797, 34 South. 782.

The earliest case to which our attention has been attracted, and which is sometimes cited as authority for the infliction of punitive damages, is that of Carlin v. Stewart, 2 La. 76, in which plaintiff was awarded $1,000 for having been called a perjured villain. His counsel appear to have regarded the award as one for punitive damages, and defendant's counsel argued that, as no special damages were proved, none could be recovered. Martin, J., as the organ of the court, said that it appeared that plaintiff had sustained no real injury by the slander, but in affirming the judgment appealed from he did not intimate that the damages allowed were intended to be punitive; the language used by him in that connection being as follows:

"In such actions the jury or court must in many cases allow damages when no special damage is shown. If a professional man is maliciously and without cause charged with being absolutely ignorant of the first principles of the science he professes, he cannot administer positive or direct evidence of the injury he may have sustained. He must be in many cases without any adequate remedy at all if the jury or the court may not find a guide in the dictates of their own conscience. On the score of the quantum of damages the jury were the legitimate judges, and we are unable to say they erred."

The case therefore falls directly within the provisions of C. C. art. 1934, § 3, to the effect that:

In actions for damages "in cases of offenses * * * much discretion must be left to the judge or jury."

In Keene v. Lizardi et al., 8 La. 27, plaintiff sued for damages for injury to his wife and himself by reason of the conduct of the captain of one of defendant's vessels upon which they were passengers. A jury returned a verdict for $100, and plaintiff appealed. It was said by this court in affirming the judgment:

"It is true juries sometimes very properly give what is called 'smart money.' They are often warranted in giving vindictive damages as a punishment inflicted for outrageous conduct; but this is only justifiable in an action against the wrongdoer, and not against persons who, on account of their relation to the offender, are only consequentially liable for his acts, as the principal is responsible for the acts of his factor or agent."

In McGary v. City of Lafayette, 12 Rob. 668, and 4 La. Ann. 440, it appeared that under the direction of certain of the city offi-

cers a portion of a building belonging to the plaintiff was illegally demolished, in violation of a pending injunction, and plaintiff brought the suit for damages, actual and punitive, and obtained a verdict for a large amount. On the first appeal (12 Rob. 668) it was held by this court

"that the acts of the president and council having been alleged to be willful and malicious, plaintiff cannot recover vindictive damages against the corporation, but only an indemnity for the loss actually sustained."

And the verdict and judgment were set aside and the case remanded for a new trial. On the second appeal it was found that the corporation had ratified the acts of its officers, but that the pecuniary damages sustained by plaintiff could not have exceeded $300 or $400, and the court, quoting C. C. art. 2294, as it then stood (now article 2315 as amended), said:

"Under that rule the reparation must be equal to the injury inflicted. But an exception is made by article 1928, C. C. [now 1934], in relation to damages resulting from offenses, quasi offenses, and quasi contracts. In those cases, says the Code, much discretion must be left to the judge or jury. * * * This disposition of law, while it gives to the judge or jury a discretion which they have not in other actions of damages, clearly intimates that the discretion thus given is not unlimited. * * * We admit that the actual loss sustained is not the measure of damages, and that the jury had a right to take into consideration the violent and illegal proceedings of the officers of the corporation. The facts of the case would, in our opinion, have authorized a verdict for $1,500, and we will decree accordingly."

And the verdict of $5,000 was reduced to $1,500.

There is, no doubt, some ground for the contention that the court intended the difference between the $300 or $400 of proved damages and the $1,500 awarded as punitive or vindictive damages, but we remain unconvinced that such was the intention, and prefer to believe that the difference in question was intended to represent the element of damage resulting from the illegal and arrogant disregard for and invasion of plaintiff's rights, since in our opinion, article 1934 contemplates the assessment only of compensatory, and not of punitive, damages. That question was considered in the case of Black v. Carrollton R. R. Co., 10 La. Ann. 33, 63 Am. Dec. 586, in which the plaintiff sued for damages resulting to himself by reason of injuries sustained by his minor son in a railroad accident; nothing being claimed for the use and benefit of the son. The court, when the judgment was rendered, consisted of Chief Justice Slidell and Justices Voorhies, Buchanan, Ogden, and Spofford. Justice Spofford took no part in the case. The elements of loss and injury upon which the claim was based were the expense imposed on plaintiff for the care of his son, his own loss of time, and the injury to his feelings. In considering the element last mentioned, Mr. Justice Buchanan, as the organ of the court, said:

"The jury seems to have taken into view the shock to the parental feelings and the solicitude and anxiety of the parents of the sufferer, which must be supposed to have been the consequences of the grave injuries and protracted convalescence of their child, and which are declared upon by plaintiff as elements of damage. But we are not disposed to admit the soundness of a doctrine which would extend vindictive damages to a case like the present. We carefully note the distinction between the immediate sufferer from a railroad accident and the relative of the sufferer, however near may be that relation. * * * But we do not understand the object of the law to be the punishment of an offending party for having been the cause of unpleasant emotions in the family and acquaintances of the party offended; and this in the form of a pecuniary compensation to the relative or friend thus affected."

And there was judgment for $5,000 in compensation for what the court concluded was the actual, and would be the future, loss of the plaintiff.

Mr. Justice Ogden in a separate opinion expressed the view that, under C. C. 1928 (now 1934), it was competent for the court to allow vindictive damages, and the inference would seem to be that he regarded the

amount awarded to the plaintiff as having been, in part, so allowed, the prospective loss not being susceptible of proof, and the amount allowed therefor constituting rather a large proportion of the whole.

The Chief Justice dissented, and stated his reasons so. clearly and forcibly that we are glad to strengthen this opinion by incorporating herein the following excerpt therefrom, interpreting the two articles of our Code which are particularly involved in this discussion, to wit: .

"The civil actions for both causes [for damages caused by offenses and quasi offenses] are given by the same article of our Code. 'Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it' [being the whole of article 2294, now 2315, as it then stood, in 1855, prior to the amendment of that year]. This article, brief as it is, distinctly designates the purpose and limit of the action. It is simply reparation—a just and adequate compensation to the plaintiff for the injury received by him from the defendant. It suggests no idea of revenge or punishment. In this light it is viewed by the jurists of France, whose Code contains precisely the same provisions. [And there follow quotations of the article of the French Code, and from Merlin, Toullier, Duranton, and Domat, to the effect that, though the action for damages may be brought by the sufferer, the action for the enforcement of penalties belongs to the functionaries to whom the law intrusts that duty, after which the opinion proceeds:] My conclusion is that there is nothing in the provisions of our Code or settled principles of our law which sanctions what are called punitory, vindictive, or exemplary damages—in other words damages which blend together the interests of society and of the aggrieved individual. I think the damages in such actions should be referred to the extent of the wrong done to the sufferer. Where a person other than the immediate sufferer is plaintiff, there is a further necessary limitation already noticed. Where the immediate sufferer is plaintiff, as he is to be indemnified, every circumstance tending to his injury, whether in mind, body, or estate, may be taken into view; but considerations cannot be entertained which do not relate to the consequences of the injury to the sufferer. The true issue in the action is the guilt of the defendant and the damage it did to the plaintiff. Criminal punishment is not to be inflicted in a civil action.

"There may unquestionably be found in our reports dicta which countenance the idea of punitory, vindictive, or exemplary damages; but casual expressions ought not to be relied upon as deliberate expositions of the law. They were probably suggested by expressions found not unfrequently in the opinions of English jurists and commentators; and their force, even as exponents of the common law, will be greatly impaired in the apprehension of any one who will read the very able and learned review by Mr. Greenleaf of the English and American cases in the recent edition of his treatise on the Law of Evidence. ,That author, whose opinion is certainly entitled to great deference, lays down the rule in these emphatic words:

" 'Damages are given as a compensation, recompense, or satisfaction to the plaintiff for an injury actually received by him from the defendant. They should be precisely commensurate with the injury, neither more nor less, and this whether it be to his person or estate.' In an elaborate note he defends this proposition, and takes occasion to express the opinion that the rule of damages, as limited by the extent of the injury to the plaintiff, was the same as in the Roman law.

"There is nothing in the article 1928 of our Code [now 1934] which, rightly considered, conflicts with the above conclusion."

The learned Chief Justice then recapitulates the provisions of the article mentioned, and quotes the last clause of the paragraph 3, and again proceeds:

"Applying the rule noscitur a sociis, and looking to the context for assistance, the intention of this clause is easily appreciated. The Code in the previous clause had treated of cases of damage where the feelings and taste are concerned; damages from their nature not susceptible of accurate and arithmetical computations, yet for which pecuniary compensation was admissible.

"Quasi offenses were very properly arranged in the same category, and their compensation submitted to the sound discretion of the judge or jury, since damages for mental anguish, or personal indignity or disgrace, etc., are incapable from their nature of any fixed rule. But the enumeration of this discretion by no means involves the idea that in the assessment of damages the court or jury can travel beyond the inquiry how far the sufferer himself is affected, or exaggerate the amount for the purpose of vindicating offended public justice, or punishing the offender as an example to others"—citing McGary v. City of Lafayette, 4 La. Ann. 440.

The same court, during the same month, decided the case of Varillat v. N. O. & C. R. Co., 10 La. Ann. 88, in which it appeared that plaintiff had sustained an injury on the same road as in the preceding case, and that counsel for defendant requested the court to charge: "That under such circumstances

the jury cannot give damages with the view to punish the defendant, * * * but are only to consider and assess the damages sustained by the plaintiff," which request was refused, and the ruling was maintained on the appeal by the majority of this court, which held that vindictive damages were authorized by C. C. art. 1928 (now 1934), and that it had been so held in Black's Case, just previously decided. Mr. Justice Spofford, who had not participated in the decision of Black's Case, dissented, saying (inter alia):

"That in an action for a private injury damages may be given against a railroad company, with a view to punish the company or make an example, is a position to which I cannot assent."

And the Chief Justice concurred in the dissent, and referred to the reasons which he had assigned in the case just previously decided.

In the case of Hill v. N. O., O. & G. W. R. Co., 11 La. Ann. 292, being also an action in damages for an injury sustained on a railroad, Chief Justice Merrick, who had succeeded Chief Justice Slidell, speaking for the court, said:

"In actions of this kind it is not within the province of the jury, although the negligence is clearly proven, to give vindictive damages, as is sometimes allowed in cases of willful or malicious injuries. It is true that in estimating the damages, where a case is made out, the jury may consider the painful nature of the wound as well as the length of time the plaintiff has been kept from his employment and the permanent character of the injury; but in assessing the damages the jury should give such reasonable sum as will really compensate the plaintiff, and no more."

If, however, we go back to C. C. art. 1934, from which the authority to inflict vindictive damages is supposed to be derived, we find that the words "willful and malicious" are not mentioned, and that the authority referred to (such as it is) is vested, by the last clause of paragraph 3 of that article, in the judge and jury, in particular classes of cases, to estimate the damages, without reference to any question of willfulness or malice. In fact, as to one of the classes, the definition of the term applied to it absolutely precludes such an idea; for by "quasi offence" is understood an act by which one person, without malicious intention, but through imprudence, causes damage to another; and as to neither of the classes does the grant contain any limitation upon the discretion vested in the judge or jury in the matter of assessing damages, save such as may be found in the common understanding that the word as thus used will be taken to mean a regulated or judicial discretion. As so interpreted, it may be exercised by the trial judge, or jury, in assessing damages for failure to comply with a contract to paint a portrait, or execute any other work of art, to establish a charitable foundation, or to supply any gratification or enjoyment, whether of religion, morality, taste, or convenience, as well as for an injury resulting from an offense, a quasi offense, or a quasi contract, all without the slightest reference to willfulness, malice, or oppression. On the other hand, to confine the application of C. C. art. 2315, to the person upon whom the physical injury is inflicted would be to strike with nullity all that part of the article which has been added since 1855, and which puts the persons therein specified in the place of the original sufferer, in the event of his death, and also gives them a right of action for the damages sustained by them by reason of his death.

Our conclusion therefore is that under our law as it now stands the right of action for the recovery of damages for personal injury, sustained through the fault of another, is personal to the injured party, so long as he survives, and, unless previously exercised by him, devolves at his death upon the persons specified in article 2315 of the Civil Code (as amended and re-enacted by Act No. 120 of 1908), who, should he die in consequence of his injury without having exercised his right, acquire also a right of action in damages for

the injury they may sustain by reason of his death, and are entitled to full indemnity with respect thereto, but that neither the person originally injured nor those who succeed to his right with respect thereto, and who acquire rights of their own with respect to the injury inflicted upon them by his death, are entitled to recover anything more in the way of damages than adequate indemnity for the injury and loss inflicted upon him and them in mind, body, or estate; there being no provision in our system of laws which authorizes the cumulation in such cases of a civil action for the redress of a private wrong with a quasi criminal prosecution for the assumed benefit of the public, but the sole purpose and principal effect of which is to increase the adequate indemnity recovered by the plaintiff as actual and compensatory damages by the addition of the pecuniary penalties imposed as exemplary, punitive, or vindictive damages.

Our further conclusion is that this case belongs to a class with reference to which the law declares in specific terms that "in the assessment of damages * * * much discretion must be left to the judge or jury," and hence that the assessment that has been herein made by the judge should not be disturbed by us unless we are satisfied that there has been an abuse of the discretion so vested in him, and, as we are not so satisfied, that it should remain undisturbed.

[4] In the case of Parker v. Crowell & Spencer Lumber Co., 115 La. 463, 39 South. 445, a father was allowed $5,000 for the loss of a minor son. In Johnson v. Industrial Lumber Co., 131 La. 897, 60 South. 608, an award of $2,326.50 in favor of a mother for the death of a minor son, of whom she had been given the custody by a judgment of separation a mensa et thoro, was increased by this court to $5,000. In this case the father and mother have united in the suit, and the judgment of $10,000 in their favor follows the precedents established in the two cases thus mentioned.

The judgment appealed from is therefore affirmed.