**SIMMONS et ux. v. DOULLUT & EWIN, Inc., et al. \***

**No. 1063.**

Court of Appeal of Louisiana. First Circuit.
Jan. 24, 1933.

Chas. A. Holcombe, of Baton Rouge, for appellants.

Taylor, Porter & Brooks, of Baton Rouge, for appellees.

MOUTON, J.

As contractor for the construction of the State Capitol in Baton Rouge, the George A. Fuller Company employed the Doullut & Ewin company, as subcontractor, to drive

the piles which were necessary for the erection of the building.

Stanly K. Simmons, son of plaintiffs, Roscoe T. Simmons and his wife, received an injury while working under the pile driver from which he died two or three days after the accident. His surviving parents have instituted this suit for damages for the death of their son, against the Doullut & Ewin company and the Union Indemnity Company, claiming $10,000 as damages and recovered judgment below for $5,000, in solido, against the Doullut & Ewin company and the Union Indemnity Company, from which this appeal is taken.

In answer to the appeal, plaintiffs are asking for an increase of the judgment to the amount claimed with legal interest.

A hammer weighing sixteen thousand pounds was used by the Doullut & Ewin company to drive concrete piles in the ground for the erection of the State Capitol building. There were several keys in the hammer, among which were incased Channel iron keys which are about eighteen inches long. During the hammering of a pile one of these Channel iron keys broke in two; one portion about nine inches in length fell on the back of Stanly Simmons' head, causing a fracture at the base of the skull from which he died about three days thereafter.

William Autrey was the pile driver engineer for the Doullut & Ewin company when Simmons suffered the injury. He did not see the accident, but testifies that he personally took out the portion of the key which had remained incased in the driver. He explains that in driving concrete piles the vibration is so great that crystallization occurs, causing these keys "to break on that type of hammers very often."

He is very positive that during operation of the machinery it would be impossible to detect the crystallization of a key or to know it is about to break. On this question, speaking of the key, he says: "You can take it out half a minute before it comes in two and you won't see nothing broke about it and all of a sudden it breaks." These keys, he explains, are incased, except that the ends stick out on each side, and if one breaks during operation, it cannot be seen; the only thing, he says, you could see, "if you were looking at it, you might see it working out."

Stanly Simmons was, at the time of his injury, an employee of the George Fuller Company and was not in the employ of the Doullut & Ewin company, one of the defendants.

W. W. Klim, who was then building superintendent of the George Fuller Company on the Louisiana Capitol project, testifies that in a conference with J. P. Ewin, vice president and general manager of the Doullut & Ewin company, and Brown, his second superintendent, it was agreed they would do every-thing they could to keep all their workmen from going under the pile driver while it was in motion or operation. He says he was acquainted with Simmons, who was employed as a helper to the field engineer in laying locations with stakes for the concrete piles "where to be driven"; that with Cotting, the immediate superior of Simmons, they gave Simmons instructions to keep at a safe distance from the pile driver while in operation. It is, however, shown that when Simmons was injured he was actually under the pile driver then in operation helping Cotting, his immediate superior, in setting out a stake for the pile driver.

It is shown by Higginbotham, also working under Cotting, employee of George Fuller Company, laying piles for the pile driving subcontractor, and who had relieved Simmons a short while before the accident, that he had to be, as he expresses it, "underneath the driver lots of times most of the time."

Harris and Williams, other employees of the George Fuller Company, testify practically to the same effect and say they were expected to go under the pile driver while in operation to set out these stakes.

The fact is that these stakes after being set out were sometimes disarranged by the movement of the earth, as explained by these employees, which required them to reset or relocate them to their original position. Evidently, this imposed additional exposure to the accidents that might result to those working under the pile driver while in operation.

Fecundus, an employee of Doullut & Ewin company and not in the employ of the George Fuller Company, testifies that he was required by Peck Rudy, foreman of defendant company, to go under this pile driver while in motion, not once but several times. In testifying about the conference between him and the officers of the Doullut Company, W. W. Klim, building superintendent of the George Fuller Company, to whom we have hereinabove referred, in speaking of the instructions they had agreed to give their employees to keep away from the pile driver, says as follows: "Similar instructions, if given by the Doullut and Ewin man in charge were to be obeyed by our men." This testimony shows that the two companies were working in cooperation, and had both a vital interest in the driving of these piles.

The fact is that in the agreement between the companies by which the Doullut & Ewin company was engaged as a subcontractor, the following stipulation is found:

"It is understood that time is the essence of this contract, and failure on the part of the sub-contractor to fulfill the time requirements shall entitle the contractor to damages etc."

Th preponderance of the evidence clearly shows that there was a continuous rush; that the pile driver was kept going most of the

time in the driving of these piles. This rush to get through with the driving of the piles within the time stipulated was obviously to avoid the penalty attached to any delay in the completion of the work by the subcontractor and in which the contractor seemed to have had a vital interest, which accounts, as we see it, for the conduct of Cotting in permitting Simmons, Higginbotham, and other employees of the George A. Fuller Company to go under the pile driver while in operation, and of Peck Rudy, foreman of the Doullut & Ewin company, in requiring Fecundus to expose himself to the same dangers.

It clearly appears from the record that if the pile driver had been stopped or had come at rest when Simmons and the other stake spotters were under the pile driver, they would have been in perfect safety from any accidents. The period of rest of the machinery would have been only five minutes to guarantee these employees from injury.

Cotting, testifying on this subject, says, if he had stopped the machinery for that period of time he would have been on the job about five minutes, which unquestionably shows that time was extremely precious to the George A. Fuller Company which he represented.

Evidently, it was equally as precious to the Doullut & Ewin company, if not more so. This is no doubt the reason why Cotting and Peck, the immediate superiors of the employees engaged in setting out the stakes, violated the instructions of their respective companies not to go under the pile driver while in operation, if such instructions were given as testified to by the superior officers.

Higginbotham and the other employees who were employed in the same line of work as was Simmons seemed to have been under the same stress of circumstances as was Cotting, as they also say they would have lost their jobs had they refused to go under the pile driver while in operation.

Simmons was helping Cotting when injured under the pile driver and, under the circumstances to which we have referred, could not be blamed for being there. We say this because he was then acting in the discharge of his duties under the authority of Cotting, his immediate superior officer.

If danger existed under that pile driver, the conditions had been created by the master and superior of Stanly Simmons.

As was well said in the case of Helm v. O'Rourke, 46 La. Ann. 178, 15 So. 400, 402, the employee under such circumstances "had the right to assume superior knowledge, skill, and judgment in his superior, under whose orders he was immediately acting, and that he would not expose him to needless danger."

■ When the employee is injured in the performance of his services while confronted with danger thus created by his employer, the latter is liable in damages, as was held in the case above cited.

There is no evidence to indicate that Simmons, a young inexperienced man of about 24 years, knew anything at all about these Channel iron keys which were incased and concealed in the hammer, and much less that he realized that by the effect of heat and incessant vibrations they could be crystallized, could break, or loosen out, and fall on those working under the pile driver.

■ The general rule is that a master must provide a reasonably safe place for his servant to work, and must see that he is not exposed to unnecessary risks in the course of his employment. At the time of his employment the master must acquaint his servant with the risks and dangers of the service. Cooley on Torts, § 550; Ryan v. Fowler, 24 N. Y. 410, 82 Am. Dec. 315; Perry v. Marsh, 25 Ala. 659; Wheeler v. Manufacturing Co., 135 Mass. 294.

The place where Simmons was working while the pile driver was in motion was certainly not safe from the danger which might result from the breaking or loosening and falling of the keys from the hammer; and there is no evidence to indicate that he was apprised of the possibility of such a danger.

■ The foregoing rule has no application when the servant assumes the risks and perils of the employment. He assumes the risk, however, only of such hazards as are apparently incidental to his employment. Smith v. Sellars, 40 La. Ann. 527, 4 So. 333. This assumption must rest upon positive knowledge or reasonable means of positive knowledge of the danger assumed. Erslew v. New Orleans & N. E. R. Co., 49 La. Ann. 96, 21 So. 153.

■ As we have heretofore explained, these Channel iron keys were incased in the hammer and could hardly be seen except under the closest observation. The evidence convinces us that Simmons did not know that the hammer was provided with such keys, and it is equally certain that he was never apprised of their existence. Much less was he aware that they could break or be loosened from the hammer. It is therefore plain that the "hazard" that caused his death was not "apparently incidental to his employment" or that he had any reasonable means of positive knowledge of the precise danger to which he was exposed. To say that Simmons had assumed the risk of the dangers which were concealed from him would be doing violence to the facts of this case and the rule of law which governs the issues herein.

■ If Simmons had been an employee of the Doullut & Ewin company, defendant herein, we do not think there could be any doubt.

as to the liability of that company. He was an employee of the George A. Fuller Company, and the contention of learned counsel for defendants is that Simmons at the time he received the injury was a third party and a trespasser, and on that ground defendants seek an avenue of escape from responsibility.

It is true that the George A. Fuller Company and the Doullut & Ewin company were separate and distinct corporate entities; that the former was the contractor and the latter a subcontractor engaged to carry out a specified piece of work in the construction of the State Capitol. It is shown, however, that the two corporations were co-operating through their employees in driving these piles and so much so that W. W. Klim, who was superintendent of the Capitol project for the George Fuller Company, says that in the conference he had held with the officers of the Doullut & Ewin company it was understood that the instructions given by the Doullut & Ewin man in charge "were to be obeyed by our men." Under such an arrangement it is clear that Simmons when setting the stakes for the driving of these piles was not a trespasser.

We are not referred to any Louisiana decisions wherein a corporation has been held in damages under facts and circumstances similar to those herein presented.

We find on this subject in Labatt, Master and Servant, vol. 1, p. 33, § 17, the following:

"Whether a person enters upon the premises of another to perform a contract of service, or to transact some business, or by the direct request of the owner, the person extending the implied or express invitation owes to the person accepting it the duty of seeing that at least ordinary care and prudence are exercised to protect him against dangers which are neither actually or constructively known to him."

Here, there was more than a mere invitation, either express or implied, as Simmons, when injured, was discharging his obligations to the George Fuller Company in helping out Cotting, his immediate superior officer, who was actually co-operating with the employees of the defendant company in completing its pile driving contract. As a matter of fact, the two companies were so closely linked or connected in the driving of these piles that if Peck Rudy, foreman of Doullut & Ewin company, had ordered Simmons to desist from going under the pile driving machine, according to the understanding which Klim says he had with the officers of that company, Simmons would have been required to "obey" his orders.

■ At least, according to Labatt, above cited, Simmons, who was more than an invitee, was entitled to protection against "dangers which were neither actually, nor constructively known to him." This protection could have been easily extended by the mere stopping of the pile driver for only a few minutes, as is shown by the evidence. The only reason he did not get this protection is because the stopping would have caused a loss of time and the consequent delay in completing the work under the contract between the two corporations. It is well established that Simmons had neither actual nor constructive knowledge of the danger of which he was the unfortunate victim; and that at no time he assumed the risks and perils of his employment which could operate as a bar to the recovery of damages by his surviving parents.

### Quantum.

■■ Plaintiffs are asking that the judgment rendered below for $5,000 be increased to the sum of $10,000, amount demanded.

The damages are claimed by plaintiffs for the deprivation of the companionship of their deceased son and for the future assistance they expected from him; also, for the excruciating pains and agony he suffered between the time of his injury and demise.

The evidence shows that his death occurred about three days after he was hurt; that during that interval he was about half the time unconscious; that he had his mother called over the 'phone by his nurse, asked for a cigarette, and enjoyed a smoke. It is shown he, at times, complained of severe headaches.

As we read the evidence of Dr. Bird and Miss Ledoux, his nurse, we do not find that he suffered the excruciating pains and agony, as alleged.

Counsel for plaintiffs refer to the case of Vincent v. Morgan's Louisiana & T. R. & S. S. Co., 140 La. 1027, 74 So. 541, where the court allowed $5,000 to each parent for the loss of a child and ask that a like amount be allowed herein to Mr. and Mrs. Simmons. The judgment in that case was rendered in 1917. Since then, financial conditions have changed immensely of which we think this court should take judicial notice. Under existing conditions we do not find that the district judge has, in assessing the damages, abused the discretion vested in him by article 1934, Civil Code, referred to in the case relied upon by counsel for plaintiffs.

So finding, we hold that the amount assessed below is fair and just, and should not be increased.

Judgment affirmed.