MORGAN W. BROWN, Guardian of MARY MCNEIL, a minor, *v.* JOHN S. CROCKETT, LUCINDA CROCKETT, and EDWARD CHAPMAN, and ESTHER CHAPMAN, his wife.

By the Statute of Tennessee, a testamentary guardian may maintain an action of ravishment of ward, or trespass against any person who shall wrongfully take away, or detain the person of the ward, and may recover damages for the same in such action for the benefit of the minor.

The tutor of a minor, deriving his authority from the law of their common domicil, has a right to exercise his personal actions everywhere.

By the Statute of 1843, guardians of minors residing in other States of this Union, and duly appointed and qualified in such States, are entitled to sue for and recover any property, rights, or credits belonging to such minors within this State, upon producing satisfactory evidence of their appointment, without being under the necessity of qualifying as tutors according to the laws of Louisiana.

A will admitted to probate in another State, and nominating a guardian to the minor heirs, and who has been duly recognized there, need not be probated in our Court, to allow the guardian to maintain an action for the wrongful abduction of his ward.

Under the law of Tennessee, the father of a minor child has a right by last will and testament to name a guardian for her.

A married woman is liable in damages to the injured party for any offence (*délit*) committed by her, and she is not relieved from liability by the fact of her husband's presence, or concurrence.

In an action for the wrongful abduction of a minor, the jury has a right to consider the mental pain inflicted upon the child as a legitimate subject of amend.

The testimony of the plaintiff—suing for the benefit of the minor, and who has no pecuniary interest in the event of the cause, was admissable. The objections would go only to his credibility.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. *Finney* and *Benjamin & Micou*, for plaintiff. *Grymes*, for defendant and appellant.

As to the right of plaintiff to maintain the action, plaintiff's counsel cited Acts 1843, 97. *Burbechaux* v. *Burbechaux*, 7 L. R. 43. 8 L. R. 88. *Bailey* v. *Morrison*, 1 An. 523. *Johnson* v. *Runnels*, 6 N. S. 622.

As to the jurisdiction of the Court below for a tort or trespass committed in Tennessee, *Homes et al.* v. *Barclay et al.* 4 An. 63.

As to the liability of a married woman for a tort or trespass: Dalloz, Dictionnaire de Jurisprudence, vol. 4, verbo *Responsabilité*, Nos. 495 to 509. Marcadé, Cours de Droit Civil, 286 liv. 3, tit. 4, art. 1384. 2 Roper on Husband and Wife, 127. Civil Code 2304, and Revised Statutes 151, sec. 31.

As to the competency of plaintiff as a witness, 1 An., 227. 2 An., 1017.

SLIDELL, J. The plaintiff in his capacity of testamentary guardian of *Mary McNeil*, a minor, sues for the benefit of his ward, for damages for a wrongful abduction of her person, and various personal wrongs suffered by her at the hands of the defendants. There was a verdict against the defendants *in solido* for $5,000, and from a judgment rendered thereon the defendants have appealed.

Much of the argument for the defence was directed to the right of the plaintiff to bring this action.

If the plaintiff was the lawful guardian of *Mary McNeil*, we have no doubt that under the law of Tennessee he was the proper person to bring suit for her benefit, and recover damages for injuries inflicted upon the person of his ward, or any violations of her personal rights. Indeed there is in evidence a statute of that State which is directly applicable to the case, and by which it is provided that a testamentary guardian may maintain an action of ravishment of ward, or trespass, against any person who shall wrongfully take away, or detain the person of the ward, and may recover damages for the same in such action for the benefit of the minors:

With regard to the right of the plaintiff to bring this action for damages in the tribunals of this State, we entertain no doubt. In *Burbechaux* v. *Burbechaux*, 7 Louis. 547, it was recognized as a well settled principle that the tutor of a minor, deriving his authority from the law of their common domicil, has a right to exercise the personal action of his pupil everywhere. By the Statute of 1843 it was enacted, that guardians of minors residing in other States of the Union, and duly appointed and qualified in such States, shall be entitled to sue for and recover any property, rights or credits belonging to such minors within this State, upon producing satisfactory evidence of their appointment, without being under the necessity of qualifying as tutors according to the laws of Louisiana.

Under both systems, such injuries to the person of the ward, as are alleged to have been inflicted in this case, creates a right to damages, which, when recovered, enure to the benefit of the ward; and under both, the actions for their recovery may be maintained by the guardians appointed in conformity to the law of the minors' domicils.

We see no difficulty in the objections that the plaintiff claims to be guardian under the will of his ward's father, and that the will has not been probated in this State. Under our statute and jurisprudence, the right to maintain the present action depends not upon the particular source of the authority of the foreign guardians, but upon its lawful existence at the place of their domicil.

This brings us to the inquiry, whether the plaintiff is really invested, under the laws of Tennessee, the domicil of the minor and his own, with the office of guardian. And upon this point we entertain no doubt. It is abundantly established by the evidence that under the law of Tennessee the father of the minor had a right by last will and testament to name a guardian for her; that he exercised that right by naming the plaintiff; that his will was duly probated in 1844; that such probate was, under the then existing law, the only step necessary to confer the right of guardianship upon the plaintiff so named; that he immediately accepted the trust, received the custody of the minor's person, and was the only person from that time to this, who under the law of Tennessee was the lawful guardian of the minor. It is true that under certain judicial proceedings, in evidence in this cause, it appears that he was ordered by a court in Tennessee to give security for his administration, a duty which under the laws in force at the time when he entered upon the guardianship, was not incumbent upon him; but there is nothing in the evidence to establish a divestiture of the guardianship; and the order to give security has been complied with.

We pass, therefore, to a consideration of the fact of the abduction, upon which depends the question whether the assessment of damages made by the jury, and which the District Judge refused to disturb, has done injustice to the defendants.

*Mary McNeil* is the daughter of *Dr. Wm. McNeil*, formerly a resident of Nashville, where he died in 1844. He left two children, *Mary*, then about ten

years of age, and her brother *William*, about three years younger. By his will he directed his whole estate, with the exception of a small portion, to be divided between them, and nominated his friend, *Morgan W. Brown*, their testamentary guardian. The fortune thus left to the minors amounted to about $150,000. On his death-bed he earnestly requested *Judge Brown* to accept the guardianship of of his children, and informed them that he had committed them to *Judge Brown's* care. Soon after his death the will was probated, *Judge Brown* accepted the guardianship and entered upon the discharge of its duties. The children were taken into his family, received from his wife and himself the most sedulous care, and were treated by them in the same manner as their own children. They have always received all the advantages of education suitable to their condition, appear to have regarded their guardian and his wife with filial affection, and to have been entirely contented and happy under their care. These facts are substantiated in the most satisfactory manner by witnesses of unquestioned standing and credibility, who lived at Nashville, and were well acquainted with *Judge Brown* and his family. One of these witnesses, *Mr. Justice Catron*, a member of the Supreme Court of the United States, besides attesting these facts, deposes as to the intimacy and great mutual regard which existed between the father of *Mary* and her guardian, and his suitableness for the charge entrusted to him. Other witnesses living in Nashville, who appear to be equally entitled to credit, concur in this estimate of his character and qualifications.

*McNeil* appears to have left no blood relations except his two children; and the nearest blood relations they have, so far as the evidence informs us, are the defendants in this suit, *Mrs. Chapman, Miss Lucinda Crockett* and *Dr. Crockett*, their natural aunts and uncle.

Since the death of the tutor various efforts have been made in the courts of Tennessee by the relatives of the minors to deprive *Judge Brown* of the guardianship, but without a successful result. It also appears that some of the relations of *Mary* had, soon after the father's death, expressed to the guardian their desire to have charge of her person, and *Mr. Chapman* had sent a letter to him to that effect by the hands of *Miss Crockett* some years since, which request he declined to accede to, explaining the sacred obligations to *Dr. McNeil* which he had assumed, but informing them that every opportunity, consistent with his duty, should be afforded them to see the children, and to cultivate relations of kindness with them.

In 1848 *Miss Crockett* and her brother, *Dr. Crockett*, visited Nashville, and called at the house of *Judge Brown*. They asked to see the children, and were permitted to do so. They represented that they intended to spend several weeks in Tennessee, and requested that *Mary* might be permitted to dine with them on the next day at the house of a friend. *Judge Brown* assented, and on the following day *Dr. Crockett* and his sister came for the child, and took her to their friend's house. After dinner they went out with the child in a hired coach, representing that they were going to make a visit to a friend who lived two or three miles from Nashville. Having thus by stratagem and false representation obtained possession of the child, they traveled with all haste in the direction of Memphis, *Dr. Crockett* taking seats in the public stages under a feigned name; and at length by the usual conveyances he and his sister arrived at New Orleans with *Mary*. Several witnesses, who saw them on the route through Tennessee, describe the child as being in great distress, imploring her abductors to take her back to Nashville, and soliciting protection at the inns where they stopped. Her conduct, as described by the witnesses, manifested throughout a strong desire to

return to her home, great attachment to those whom she had been accustomed to regard as her parents, and such resistance as a child could make under the extraordinary circumstances in which she was placed.

On the arrival of the parties at New Orleans, the child was taken to the house of *Mrs. Chapman.* Her movements there would seem to have been in some degree guarded, but there is no reason, from the evidence, to infer any unkindness on the part of her relations at New Orleans.

As soon as it was found that the child had been carried off, great alarm and distress were manifested by the plaintiff. Measures were taken, at much expense and trouble, to discover the fugitives, and a gentleman of the bar was despatched to New Orleans in search for the child here. After an interval of a few days, he ascertained that she was at the house of *Mr. Chapman,* and applied to one of our courts for writs of *habeas corpus,* which were served upon *Lucinda Crockett, Dr. Crockett* and *Chapman.* After service on the 2d May upon the latter, the child was taken by *Mrs. Chapman* out of the parish, to the plantation of a friend. *Chapman* appeared on the 3d May, and answered under oath that it was impossible for him to comply with the order to produce the child,. "as the said *Mary McNeil* is not in his custody, nor has she ever been in his custody or under his control." *Lucinda Crockett* answered under oath that she did not know where *Mary* was. In an amended answer, made on the 4th of May, *Chapman* declared that *Mary* had left his house on the previous day, and that he did not know with whom she left, where she went, or where she was. His answer was excepted to as evasive; he was required to answer further, and an order of arrest was issued against him. On the following day, having been arrested, he filed a further answer under oath, in which he says he may have suspected that his wife had left his house with *Mary McNeil,* but that he did not know, nor had he any means of knowing the fact, as every thing relating to the departure took place during his absence from home, and was concealed from him; that the first information he had of the fact that his wife had left with the said *Mary McNeil,* was derived from the testimony of a witness examined before the Court on the previous day. That he had despatched a messenger to the adjoining parish, whither they had gone, urging their return. *Dr. Crockett* in his answer admitted the abduction, set up various matters in justification, and declined to obey the order of the Court. The place of concealment of the minor in an adjoining parish being ascertained, further writs were issued, and on the 6th May *Mrs. Chapman* appeared in Court with the child. She answered under oath that she had not held the child in confinement, but that being her neice, and having been placed in her possession by her brother, *Dr. Crockett,* she had taken the best possible care of her, and in doing so believed she had acted for the best interest of the minor; but that as soon as the writ was served upon her, she had returned with the child to New Orleans from the residence of a friend in an adjoining parish, where they were on a visit which the minor expressed a desire to make.

The District Judge being of opinion that stratagems and violence had been employed to take *Mary* from the custody of her lawful guardian in a sister State, ordered her to be delivered to the plaintiff's agent, which was accordingly done, the child declaring, in the presence of the Court, her anxiety to return to the plaintiff, and manifesting much delight at her release.

Such is substantially the state of facts upon which the plaintiff relies for an affirmance of the verdict. We deem it our duty to say that a more extraordinary violation of law and personal liberty has never been presented in the annals of our civil jurisprudence; and no terms of censure of the conduct of *Dr. Crock-*

*ett* and his sister, however strong, could be considered undeserved. The only palliation which counsel has attempted to offer, is in the suggestion, that they were prompted by a strong impulse of natural affection. But a court cannot listen favorably to a suggestion of good motives from parties whose conduct in the transactions which they attempt to defend is stained by disreputable artifice.

But it is said that the verdict is unjust as to *Mr.* and *Mrs. Chapman*, who did not participate in the forcible abduction of the minor from Tennessee, and merely opened their doors to her on her arrival at New Orleans.

It is true that there is no direct evidence that the abduction was committed at their suggestion, or that they had advised or encouraged it; but it was distinctly charged in the petition, that *Mr.* and *Mrs. Chapman* were accessory to the abduction, and the jury seemed to have inferred that the charge was true, inasmuch as they have found the same amount of damages against all the defendants. When we look to the conduct of these two defendants, after the minor's arrival here, and the surrounding circumstances, we are constrained to say that they are not of such a character as to permit us to disturb the verdict of the jury. Considering the relation by blood, or marriage to the two principal actors in this strange drama, and to each other, the previous desire manifested by *Mr. Chapman* to have possession of the child, the reception of the plaintiff's ward at their house, the grossly unjustifiable attempt to evade the writ of *habeas corpus*, the painful disingenuousness, to use no harsher term, of their answers under oath, we are not prepared to say that the charge of complicity is unsupported by the evidence.

The exception separately pleaded by *Mrs. Chapman* was properly overruled. That under our jurisprudence a married woman is liable in damages to the injured party for an offence (*délit*) committed by her is clear, and she is not relieved from liability by the fact of her husband's presence or concurrence. See Merlin, verbo *Autorization Maritale*, No. 18. Whether marital coercion would excuse her, or go in mitigation of damages, is a question which does not arise in this cause.

It is said the damages allowed by the jury are excessive. We do not think so. In the first place, expense to more than half of the amount allowed, has been actually incurred, as the evidence shows, in the effort made to search for the ward and restore her to the custody of her guardian. In the next place, the jury had clearly a right to consider the mental pain inflicted upon the child, a legitimate subject of amend. See Civil Code, Art. 1928. In doing so, "much discretion must be left to the jury," ib.; and the exercise of this discretion a court will not disturb on light grounds, but will restrict its control to cases of manifest excess. We have no reason to consider the verdict in this case passionate or capricious; on the contrary, when the aggravated circumstances of the wrongs complained of are considered, it seems to us that the jury used their power with moderation.

The testimony of *Brown* was properly admitted. He sues for the benefit of the minor, and does not appear to have any pecuniary interest in the merit of the cause. Doubtless the court in Tennessee, to which he owes an account of his administration, would allow him credit for the moneys he has reasonably expended in his efforts to recover the person of his ward, even if he did not succeed in collecting their amount in the form of damages from the wrong-doers. That he feels a deep moral interest in the success of this suit may be assumed; but this would go only to his credibility. See *DeKerlegand* v. *Robins*, 1 Annual, 227. *Parker* v. *Moore*, 2 Annual, 1017.

Judgment affirmed with costs.