FOURNET, Justice.
 

 Plaintiffs, the owners of a large tract of land located in the Bayou Blue Dome area of Iberville Parish, are seeking to recover damages in the sum of $25,600 from the Humble Oil and Refining Company for its alleged illegal trespass upon their property for the purpose of conducting a geophysical test thereon and for the dissemination of the information thereby secured to plaintiffs’ injury. The defendant filed an answer denying generally the allegations of plaintiffs’ petition and from a judgment in favor of plaintiffs in the sum of $7,500 prosecutes this appeal. Plaintiffs, answering the appeal, are asking that the judgment be increased to the full amount sued for.
 

 The Bayou Blue Dome, situated in Township 9 South, Ranges 10 and 11 East of Iberville Parish, was discovered in 1926. The defendant, either by purchase, lease, or contract, holds the mineral rights on all of the land under which the dome lies with the exception of the property owned by the plaintiffs, comprising some 950 acres of swamp land. Since the discovery of the dome and prior to the time the defendant company began developing it, a number of oil companies drilled on the dome, some seventeen wells having been drilled between the years of 1928 and 1932. However, with the exception of one well drilled in Section 74 of Township 9 South, Range 10 East, by the defendant company, very little, if any, oil has been discovered in paying quantities.
 

 The defendant company having encountered salt at a much shallower depth than anticipated because of the unexpected “nosing out” of lobes of salt, its well on the south flank of the dome, known as the Wilbert No. 5, resulted in a dry hole. In order to avoid similar costly experiences in drilling the east, north, and west flanks,
 
 *607
 
 the company undertook to make a torsion balance survey of the dome. It was while conducting this survey that the defendant' entered upon plaintiffs’ property, after permission to do so had been refused, cut a path diagonally across the southeast portion thereof to a depth of approximately 1,800 feet, and placed four torsion balance stations 200 meters apart thereon where the geophysical tests were made. The area of plaintiffs’ property involved in making this survey comprises approximately 55 acres.
 

 It is. the contention of plaintiffs that the trespass was willfully and deliberately committed by the defendant company for the purpose of obtaining information of value to itself and that, having disseminated the information so secured to the prejudice and injury of the plaintiffs, they are entitled to recover from the defendant (1) the value of the right to enter upon and conduct a geophysical survey on their property, and (2) the loss incurred as a result of the unfavorable publicity given with respect to their property.
 

 The defendant, on the other hand, now admitting the trespass, contends it was unintentional and inconsequential; that no information of value was derived as a result of the survey; that the survey did not and could not have affected the mineral value of plaintiffs’ land; and, finally, that plaintiffs did not prove damages within that degree of certainty which the law requires.
 

 The trial judge, in a well considered written opinion, concluded that although there was no direct testimony to show the trespass was willful, as contended by plaintiffs, the preponderance of the evidence, nevertheless, showed the trespass was committed “through lack of proper prudence, diligence and skill on the part of defendant’s employees engaged * * * in the geophysical survey * * and that the defendant is, therefore, responsible for such damages as the plaintiffs may have suffered as a result of the acts of defendant’s agents and employees, which amount the court fixed at $7,500. In arriving at this amount the court was of the opinion that the proof was convincing that the defendant had not only wrongfully availed itself of a valuable privilege on plaintiffs’ land, for which it must compensate them, but that by its acts the defendant company had caused “disparagement of mineral quality of the plaintiffs’ land resulting in loss to plaintiffs through the depreciation of its leasing value * *
 

 From a review of the record we find, as did the trial judge, that the plaintiffs have failed to prove the damages actually suffered by them in dollars and cents.
 

 “Perfect ownership gives the right to use * * * and * * * dispose "of one’s property in the most unlimited manner * * Article 491, Revised Civil Code. The right to permit entry upon land to conduct geological surveys or for the purpose of exploring for oil, gas, or other minerals is a valuable property right and belongs exclusively to the owner. See the case of Mt. Forest Fur Farms of America v. Cockrell, 179 La. 795, 155 So. 228.
 

 We have held that the depreciation of the value of lands and the servitudes or mineral rights thereon resulting from the
 
 *609
 
 negligence of operators on adjoining land in the operation of a gas well gives rise to a cause of action against the operator to the extent of such depreciation. McCoy v. Arkansas Natural Gas Company, 184 La. 101, 165 So. 632.
 

 Under the express provisions of the Revised Civil Code: “Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it * * Article 2315. And “In the assessment of damages * * * in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury * * Clause 2 of Paragraph 3 of Article 1934, Revised Civil Code.
 

 A careful analysis of the jurisprudence under the latter article clearly shows that compensatory damages only may be allowed by the court or the jury to a person against whom an offense or quasi offense has been committed. The damage must be certain and the jury or the trial judge has discretion only as to the extent thereof, which, of course, must be ascertained from all of the facts and circumstances of the case under consideration. See Carlin v. Stewart, 2 La. 73; McGary v. City of Lafayette, 4 La.Ann. 440; Brown v. Crockett, 8 La.Ann. 30; Watson v. Kennedy, 8 La.Ann. 280; Black v. Carrollton Railroad Co., 10 La.Ann. 33, 63 Am.Dec. 586; Chataigne v. Bergeron, 10 La.Ann. 699; Choppin v. New Orleans & C. R. Co., 17 La.Ann. 19; Frank v. New Orleans & C. R. Co., 20 La.Ann. 25; Tissot v. Great Southern Tel. & Tel. Co., 39 La.Ann. 996, 3 So. 261, 4 Am.St.Rep. 248; Lewis v. Holmes, 109 La. 1030, 34 So. 66, 61 L.R.A. 274; Bourg v. Brownell-Drews Lumber Co., 120 La. 1009, 45 So. 972, 124 Am.St.Rep. 448; Vincent v. Morgan’s Louisiana & T. R. & S. S. Co.,
 
 140
 
 La. 1027, 74 So. 541; Schmidt v. City of New Orleans, 160 La. 281, 107 So. 110; City of New Orleans v. Shreveport Oil Co., 170 La. 432, 128 So. 35; Louisiana Farms Co. v. Yazoo & M. V. R. Co., 179 La. 539, 154 So. 445; Linen Thread Co. v. Shaw, 1 Cir., 9 F.2d 17; Shell Petroleum Corp. v. Scully, 5 Cir., 71 F.2d 772; and Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, 548.
 

 The only case in the jurisprudence of this state touching upon the subject matter involved here is that of Lebleu v. Vacuum Oil Company, 15 La.App. 689, 132 So. 233, 776. In that case the Court of Appeal for the First Circuit allowed $100 damages for trespass on plaintiff’s property but rejected his claim for $500 for alleged depreciation in the lease value of the property, finding as a fact that the defendant company did not secure any information with reference to plaintiff’s land and that it could not have, consequently, destroyed the lease value thereof.
 

 In the case of Shell Petroleum Corporation v. Scully, 5 Cir., 71 F.2d 772, 776, as in the case at bar, a trespass had been committed for the purpose of making a geophysical test, but, unlike the case under consideration, the information obtained from such test was immediately given to the plaintiff. The theory of the case was that the plaintiff was entitled to be paid
 
 *611
 
 for the privilege of conducting a survey on his property which had been taken by the defendant company without the plaintiff’s consent or payment therefor. In deciding the case the United States Circuit Court of Appeal for the Fifth Circuit, having under consideration the above quoted articles of the Revised Civil Code, commented as follows: “Under the applicable Code articles, it is for the jury to fix it, not by way of penalty, but compensatorily. Vincent v. Morgan’s La. & T. R. & S. S. Co., and Lebleu v. Vacuum Oil Co., supra. Thus fixed, it is to be measured, not absolutely, but as near as may be under the Code, by the value of that which the defendant took. It is for the jury to fix it upon consideration of the whole evidence, under appropriate guiding instructions. In this admeasurement all the circumstances of the actual taking have their due weight. * * * They should, in short, consider all the circumstances of the taking and its consequences, in an endeavor to give plaintiff that compensation which the Code allows. Under appropriate instructions, it is for them to say, under all the circumstances, whether the damage awarded shall be a little more than nominal, as in Lebleu’s Case, supra, or substantially more. It is for them to fix, not vindictively but compensatorily, in the light of all the disclosures, the value of the privilege defendant has assumed to take on plaintiff’s land.”
 

 It is generally known that the discovery of a salt dome in this section of the country makes the land under which the dome lies and that immediately adjacent thereto potentially productive of oil and gas. The approved and modern method of discovering and locating salt domes is by geological surveys and tests. These are usually conducted with the permission of the land owner under lease contracts. A block of leases for such purpose is ordinarily obtainable for a cash bonus with the usual stipulation that drilling operations will be begun within a definite time, the delaying of this period being optionable upon the payment of a yearly rental. Once the dome is discovered and found to extend under land beyond the territorial limits under lease, and that fact becomes known, the property thus situated becomes very valuable, and the owner usually demands and receives a very good price for a lease on the property, the amount depending upon the circumstances and facts of the case.
 

 In this case although the Bayou Blue Dome was discovered in 1926 and some seventeen wells had been drilled thereon, at the time the survey here complained of was being conducted the defendant was still operating on the dome with the view of definitely establishing its extent and productive area. In the drilling of its Wilbert No. S well salt was encountered at a higher level than was anticipated, causing loss of the well. It was in order to avoid a recurrence of this costly experience that -the geophysical survey was conducted by the defendant. The survey was begun in December of 1937 upon the lands under lease to the defendant company and was discontinued some time in January of 1938 when plaintiffs’ land was reached because they had re-fused to grant the company permission to enter upon the land to conduct the
 
 *613
 
 geophysical test unless it paid a bonus of $50,000 and agreed to drill the property. The survey was resumed in March of 1938 after another effort had been made to secure permission to enter on plaintiffs’ land and, according to the testimony of defendant’s witnesses, the survey was completed on May Ü, 1938.
 

 In the meanwhile, on February 23, 1938, the defendant “spudded in” its Wilbert No. 6 well only a little over half a mile from the southern boundary of plaintiffs’ land. This naturally stimulated interest in the oil and mineral activities with respect to the property in the vicinity that was not under lease to the defendant.
 

 Johnnie Mitchell, an independent operator who testified on behalf of the plaintiffs, stated that he held a lease on the Blanchard tract adjacent to plaintiffs’ land immediately to the east calling for the drilling of a well within 90 days but that he abandoned the same on May 11, 1938, upon the advice of Mr. Morgan Davis, a geologist with the defendant company, that the location was not a good drilling prospect because of the fact that the salt there was too deep for successful’drilling, a depth of 6,991 feet having been reached on the Wilbert No. 6 well without salt having been encountered. He also testified that if he had drilled a well on the. Blanchard property in accordance with his plans it would have been located some four or five hundred feet from plaintiffs’ property and that this would have had the immediate effect of making plaintiffs’ property worth $100 an acre for leasing purposes.
 

 The evidence further shows that J. G. Sutton and his son, Johnson Sutton, independent oil operators of Vinton, Louisiana, travelled to the vicinity of this oil activity and there contacted' Mr. Dewey D. Angelloz, the plaintiff who represented all of the other members of his family in the matter, with the view of developing plaintiffs’ property. Angelloz testified that he offered to execute a contract on the property, with a drilling clause therein, in favor of the Suttons for a cash bonus of $46,000 and that Sutton countered with an offer to give him a cash bonus of $23,000 and $23,-000 in oil payments, which plan he refused. In this respect he is corroborated by the testimony of Captain S. B. Mullins who was present at the time of the conversation, having accompanied the Suttons when they contacted Angelloz. The Suttons denied having made the offer but a review of the testimony of all of the parties on this point reveals that the testimony of the Suttons is evasive and otherwise unsatisfactory and we must, therefore, give the testimony of the plaintiff and his witness more probative value.
 

 The record further reveals that the plaintiffs had some time thereafter (in March of 1938) been willing to execute a contract in fávor of Mahoney and Miller for the drilling on plaintiffs’ property within 90 days, to guarantee the performance of which Ma-honey and Miller agreed to deposit $5,000 in the bank. Although the necessary papers were drawn up, the two parties did not appear to execute the same, nor was the amount of $5,000 deposited.
 

 The defendant contends that the information its Mr. Davis gave to Mr. Mitchell on May 11, 1938, was not obtained from the
 
 *615
 
 geophysical survey but from its own drilling operations and that this information was open to the public at the office of the Louisiana Department of Conservation, and, moreover, that Mr. Davis was not advising Mr. Mitchell with reference to the Angelloz property but with reference to the Blanchard property. Another contention of the defendant is that the date of the alleged offer by the Suttons for a lease on the Angelloz property was over a month prior to the resumption of the torsion balance survey in March, 1938, and that the failure of the consummation of this offer could in no wise have been caused by the survey, particularly when the testimony shows that the offer was refused by the Angelloz heirs. Still another contention is that the plaintiffs’ willingness to accept the Miller and Mahoney offer strongly indicates the value of their land; that there was no evidence of any leases having been executed in the vicinity; that according to plaintiffs’ own testimony the property was worth at the time of the trial of the case in October of 1938 far in excess of the amount of the damages claimed; and that the plaintiffs have, therefore, suffered no damage or depreciation in the value of their property.
 

 The defendant further contends that “The only testimony in this record with respect to the mineral value of lands adjacent to the Angelloz property or similarly located as the Angelloz property with respect to the geological center of the Bayou Blue Dome is that introduced by defendant,” and points out to the court that the maximum price paid was $10 an.acre.
 

 The opinion of the trial judge reflects that, in fixing the quantum of damages awarded in this case, while he was of the opinion that the plaintiffs had failed to prove the full value in dollars and cents of the damage actually suffered by them, he nevertheless was of the opinion that the defendant, in conducting the survey, did receive information of value to it and concluded that the survey had caused “disparagement of mineral quality of the plaintiffs’ land resulting in loss to plaintiffs through the depreciation of its leasing value. * * *”
 

 From our review of the record, when all 'of the facts and circumstances of the case are considered, we cannot say that the trial judge abused the discretion given him in fixing the quantum of damages or that the amount awarded is excessive. The argument of defendant’s counsel that, according to the testimony of plaintiffs’ own witnesses^ the property at the time of the trial of the case was worth far in excess of the amount they claimed the property was worth at the time the trespass was committed is without merit when considered together with the evidence which conclusively shows that the plaintiffs, after exhausting every possible source, were unable to lease the property at any price subsequent to the making of the alleged second geophysical survey. The only offer made them was by the defendant, who, during the trial of the case, tendered the plaintiffs, as a compromise of this suit, its check for $7,200 for the execution of a contract of lease on 480 acres of their land, contending the remaining portion of the tract was without potential mineral value.
 

 We are fortified in this conclusion for, by taking the defendant’s own standard of
 
 *617
 
 values, we find that it paid $10 an acre on January 18, 1938, for the Wilbert property, which is admittedly similarly located to plaintiffs’ land, more than a month prior to the “spudding in” of its Wilbert No. 6 well. Since the company paid $10 an acre for this land while its alleged first survey was in progress and immediately after its conclusion located its Wilbert No. 6 within a little more than half a mile from plaintiffs’ property, it reasonably follows that the property of the plaintiffs should have commanded a higher price for mineral potentialities.
 

 For the reasons assigned the judgment of the lower court is affirmed at defendant’s cost.