UNITED STATES of America
v.
**31,221.07 ACRES OF LAND, MORE OR LESS, SITUATED IN VERNON PARISH, LOUISIANA, and Pickering Lumber Corporation et al.**

**UNITED STATES of America**
v.
**33,488.04 ACRES OF LAND, MORE OR LESS, SITUATED IN NATCHITOCHES, SABINE AND VERNON PARISHES, LOUISIANA, and Peavy-Wilson Lumber Company, Inc., et al.**

Civ. A. Nos. 831, 3108.

United States District Court
W. D. Louisiana,
Lake Charles and Shreveport Divisions.

April 27, 1956.

Rehearing Denied June 26, 1956.

T. Fitzhugh Wilson, U. S. Atty., and Edmund E. Woodley, Asst. U. S. Atty., Shreveport, La., for the Government.

Lawes, Cavanaugh, Hickman & Brame, Lake Charles, La., Gold, Hall & Skye, Alexandria, La., Simon & Carroll, Shreveport, La., Broyles & Funderburk, Leesville, La., Richard L. Crowell, Alexandria, La., for defendants.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

Presented by this record is an example of how the property rights of private citizens, guaranteed by the Federal Constitution and Statutes, can be almost literally trampled by an arrogant and indifferent bureaucracy, in the name of "public interest".

These condemnation suits were filed respectively in 1948 and 1950. That long ago the Government took from defend-

ants, for National Defense purposes, their legal right to explore for minerals they owned, or their right to have them exercised by others, to whom they might have leased them, in nearly 65,000 acres of land. The taking was a so-called "moratorium" against defendants' use of such rights for seven and one-half years in one case and ten years in the other, or until May 14, 1958.

When the suits were filed, no estimation was made by the Government as to the market value of the interests condemned, and it made no deposit of any kind to pay the owners for the rights being taken. Somewhat later, we have been told officially, the Government informally offered defendants the sum of 15¢ per acre, which, of course, was declined.

Shortly after this Judge assumed the duties of office, in early 1954, these long-pending cases were placed upon the calendar for trial. At a pre-trial conference, we were advised by all counsel of record that, approximately a year beforehand, Government counsel had recommended to the Army Corps of Engineers a settlement offer, on the basis of $2.50 per acre, submitted by defense counsel because of further anticipated delay in trial as well as potential trial expense. Despite numerous follow-up letters, and repeated recommendations by Government counsel, they had been unable to get a "yea" or "nay" reply.

After some discussion, it was agreed by all counsel, and the Court, that the Court would write to the Chief of Engineers, calling attention to what had happened, and requesting that an answer be given one way or another, in order that it might be determined whether the cases must be tried. This was done. Finally, almost three months later, a subordinate in the office of the Chief of Engineers replied to the Court's inquiry, stating that defendants' entire mineral interests —not just their right to exercise them— would be condemned permanently in new suits shortly to be filed. It was suggested that trial of the cases be deferred until this could be done.

When nearly another year had passed and no further action had been taken by the Government, the cases again were placed on the trial calendar. At another pre-trial conference, wherein Government counsel insisted that the values of each of the large number of tracts were different, and must be tried separately, indicating trials of many weeks' duration, we concluded that a three-man Commission should be appointed pursuant to Rule 71A(h), 28 U.S.C.A. All counsel concurred in this decision.

The Commissioners were selected after careful investigation and assurance as to their qualifications. A prominent and able member of the Lake Charles Bar was named as Chairman, it being our opinion that a lawyer ought to be designated in that capacity in order properly to rule upon the admissibility of evidence and to phrase the Commission's findings and report. A well known business man and an experienced, independent, oil-and-gas-lease broker, having no interests in the areas involved and no connection with the Government or defendants, were appointed as the other two Commissioners. All three men are of the highest integrity and capability. We are satisfied that they acted impartially at the hearings, in their review and analysis of the evidence, and in their conclusions.

The Commission was appointed in April, 1955, held hearings in May and August of that year, and filed its report on November 13, 1955. It determined that, as of the respective dates of condemnation, the interests condemned from defendants in the Peason Ridge Artillery Range were worth $4.50 per acre, and those in the Camp Polk Range were valued at $4 per acre.

It now has developed that the actual trial took only five days, mainly because the Government abandoned its "separate tracts and different values" theory, and itself offered evidence as to over-all values only. Nevertheless, we are more than satisfied in having used the Commission, because we are convinced that it made proper awards, in full justice both to the defendants and the Government. Prob-

ably, on the evidence presented, a jury would have awarded defendants more than the Commission has allowed, if for no other reasons than the lack of substantiation and arbitrary methods employed by the Government witnesses in fixing their appraisals.

(Parenthetically, we must note for the record that Government witness Sidwell, in his testimony before the Commission, and without discernible reason, placed a value of $1 per acre on the interests condemned, as contrasted to $2 per acre fixed by the other Government witness, Spice, as to Peason Ridge. This same "expert", a few weeks beforehand, while testifying before the Court in Shreveport as to values involved in several small, uncontested tracts included in the same suits, swore that the value was 15¢ per acre, less than one-sixth of his later figure. We cannot help wondering, as the Commission must have when he could not furnish any substantial or specific reasons for his appraisal, whether he simply was guessing in the direction he thought he was supposed to guess.)

Defendants have moved to confirm the awards, whereas the Government, for its part, opposes all that has been found, by the Court and by the Commission.

In our review of the record, we have studied the testimony and exhibits, have considered carefully the respective briefs and authorities cited, and have concluded that the awards are right, fair, substantiated by the overwhelming weight of the evidence, and must be confirmed.

The Government's chief complaint is directed at our instructions to the Commission, and its compliance therewith, as to the admissibility and materiality of certain evidence. The particular instructions were:

" * * * As an element in your determination of the fair market values of the mineral rights involved here, you may consider the amounts paid, in the form of bonuses and delay rentals, in connection with oil, gas and mineral leases covering other property in the vicinity of the land included in these Artillery Ranges, at times reasonably prior to the dates when the rights herein condemned were taken, and at all times during the existence of the moratoriums which have prevented the exercise of such rights by defendants. * * *

"For the purpose of proving the fair market values of these mineral rights, both the Government and defendants should be permitted to show, by certified copies of oil, gas and mineral leases, the amounts paid as bonuses and delay rentals for leases within a reasonable distance of the Ranges, in accordance with the instructions given above. In offering any such mineral leases, or other documents recorded in any of the Parishes involved, either party should be permitted to introduce copies of the originals, certified to by the Clerk of Court of such Parishes, in lieu of offering the original documents."

These instructions were based upon Shell Petroleum Corp. v. Scully, 5 Cir., 71 F.2d 772, and upon the law of Louisiana as found in Holcombe v. Superior Oil Company, 213 La. 684, 35 So.2d 457; Angelloz v. Humble Oil & Refining Company, 196 La. 604, 199 So. 656; see also 20 American Jurisprudence 755, Verbo "Evidence", § 899; as well as upon what we consider to be the rule of reason. The cases cited by the Government clearly are not in point.

If the Government is correct in its contention that such evidence legally is not admissible, we can conceive of no practical means by which the values of the peculiar interests here condemned can be fixed.

The only methods by which mineral rights may be exercised in Louisiana are 1) by the owner himself going upon the land and exploring for the minerals, and 2) by the owner leasing the right to do so to another or others for bonuses, rentals and royalties. Here defendants have been deprived of those rights by the Government, in one case for seven and a half years and in the other for ten years. That such rights have a value is not dis-

puted and is even grudgingly conceded by the Government. Yet their counsel say that evidence as to prices others in the immediate vicinity have received for similar rights is not admissible or material, and that such figures are speculative. If regard is not had for reasonable probabilities, which include, in the nature of things, a comparison of bonuses and rentals obtained by other mineral owners in the vicinity, we ask—How else can the just compensation which is due to defendants be determined, without engaging in the rankest speculation? Must we rely, as the Government apparently would have us do, on the mere unsupported "opinions" of so-called "experts", who are not even reasonably familiar with the territory involved? We think not.

The Government's own witnesses testified that such evidence not only is an element which should be considered in fixing value, but that *they themselves considered it*! The figures they gave, however, do not reflect such consideration.

We know of no truer axiom than that "hindsight is better than foresight", and it is peculiarly applicable here. If a jury, Commission or Court had been called upon to fix the values of the interests here condemned on the day of their condemnation, any figures on future income would be, at best, merely an "educated guess". Here, the admission of evidence as to the amounts received by other mineral owners within a reasonable distance of the property involved, at times reasonably coincident with the periods of these moratoriums, has served to eliminate most of the guesswork usually and necessarily involved in any appraisal, and to render all the more valid the Commission's determination of fair market values at the time of the taking.

It is true, as the Government contends, that when the moratoriums expire, defendants still will own the mineral rights. It cannot be gainsaid, however, that they have been deprived of using them in the meantime, and this deprivation includes all income which such rights otherwise would have produced.

We think the Commission's formula, in arriving at "fair market values", was em-

inently sound and was based upon solid reasons finding strong support in the record. Obviously, it believed defendants' witnesses who were familiar with values in the area involved, and did not believe the Government's witnesses, who had had no experience there except in preparation for their testimony at the trial.

For the reasons given, all of the Government's objections to the awards of the Commission are overruled and denied; defendants' motion to confirm is granted, and the awards of the Commission will be made the judgment of the Court.

Proper decrees, in each case, should be presented for signature.

Addendum

Since the above ruling was filed, an application for a rehearing, submitted by the Government, has been denied; and, without appealing, the Government has agreed to pay defendants the amounts of the Commission's awards, interest being waived.