LUIS H. CARRASQUILLO, Plaintiff and Appellee, *v.* LIPPITT & SIMONPIETRI, INC., RAFAEL MACÍAS LÓPEZ, UNITED STATES CASUALTY CO., Defendants and Appellants.

No. R-66-295.      Decided February 16, 1970.

*Emilio de Aldrey* for appellants. *César J. Dones Magaz* for appellee.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

As a result of the impact caused by a van, owned by the firm D. Serra & Cía. on the rear part of appellee's vehicle, accident which occurred on July 7, 1959, the latter claimed from the insurance company of said firm the damages caused to his person, and from adjuster appellant Macías, and from appellant, Lippitt & Simonpietri, for their tortious acts in detriment of appellee's rights.

The trial court concluded that (1) as a result of the accident appellee suffered multiple bruises and ecchymoses which mainly affected the thorax, the right shoulder, and both arms, and the cervical muscles; he was under treatment for one month; (2) appellee's vehicle was a total loss whose value was fixed by the parties at $1,200, and; (3) on July 10, 1959 and in the lot of Serrano, owner of a paint and tinsmith's shop where appellee's vehicle was taken, appellee in the company of his father, and Macías, adjuster and Lippitt's agent in Ponce met; they agreed that said vehicle was a total loss; they bargained extensively on the amount to be paid for said loss; after drinking whiskey at Macías insistence who as-

sured appellee that to mix alcohol with the drugs he had been drinking did not cause harmful effects, the parties settled the claim for the loss of said vehicle at $1,200; to that effect appellee signed a printed form of release from "any and all the actions, causes of actions, claims, and complaints" which he may have as a result of the accident in question; when appellee made it clear that they were only compromising the loss of the vehicle, Macías "assured him that there would be no problems concerning personal damages, told him to go and have an X ray taken and when he was discharged to go to the office in San Juan to reach an agreement"; (4) when he received a check for the $1,200 with a voucher which explained that said sum covered $100 for the personal injuries, and $1,100 for the loss of the vehicle, appellee telegraphed Macías clarifying the terms of the compromise; the latter answered denying the content of the telegram and requesting the return of the check if appellee did not agree; once he was discharged, appellee and his father had an interview in San Juan with Macías who insisted on the fact that the check showed the transaction; (5) that Macías bargained in bad faith for the purpose of deceiving Carrasquillo, making false and fraudulent representations, "relying his conduct on the signature he had obtained in the release and the impression that in action he was free and did not give rise to a cause of action—position which he assumed before the court and which was rejected in *Carrasquillo* v. *Superior Court*, 87 P.R.R. 628 (1963)"—; (6) the principals of Macías, Lippitt & Simonpietri, approved and adopted the former's ill-intentioned and fraudulent action; (7) "Macías' total conduct, adopted by Lippitt & Simonpietri, reveals a fraudulent scheme and an attitude of repulsive moral callousness: a retinue of congenial collaborators in an atmosphere of hypocritical cordiality; false flattery, explanations, and promises for the sole purpose of obtaining the signature on the release; a change of attitude and behavior immediately after obtaining the signature, fact

revealed by the postponement of the delivery of the check and the copy of the release, the preparation of the check with the absurd sum of $100 for personal injuries, Macías' letter falsifying the facts and pressing his financial advantage; the refusal to receive Carrasquillo; the insistence that he was legally exempt upon obtaining the signature in the release, and the contumacy and obstinacy in asserting his advantageousness and lack of scruples during seven years."

By virtue thereof, the trial court rendered judgment ordering (a) the insurer to pay $3,700 to appellee for the injuries to his person and for physical and mental suffering; (b) Lippitt & Simonpietri and Macías to pay severally and jointly $10,000 to appellee as compensation for having been the victim of their deceitful, fraudulent and tortious conduct; and (c) appellants, to pay severally and jointly, the sum of $3,000 for attorney's fees plus costs.

Feeling aggrieved, appellants assign that the trial court erred:

(1) In concluding that in the signing of the release by appellee there was fraud or deceit on Macías Lopez' part, and in failing to conclude that there could have been a misunderstanding between the parties concerning the injuries suffered by plaintiff without there necessarily being a fraudulent conduct on Macías part.

(2) In holding Lippitt & Simonpietri liable for $10,000 for Macías' conduct and the latter also, when appellee did not establish any damage said amount being for punitive damages which do not lie in our jurisdiction.

(3) In granting appellee the excessive amounts of $3,700 for injuries suffered, and of $3,000 for attorney's fees.

(4) In making findings of fact contrary to the evidence submitted and that in rendering judgment the trial court acted moved by passion, prejudice, and partiality.

■ 1.—It is a constantly reiterated doctrine that fraud is never presumed, that is, that it can never be a matter of mere conjecture. In order to prove the simulation, proof sufficient to satisfy the judicial conscience is required. *Ledesma* v. *Ledesma*, 84 P.R.R. 160, 162 (1961); *Feliciano* v. *P. Cedeño, S. en C.*, 78 P.R.R. 37, 40 (1955). In *Cruz* v. *Water Resources Authority*, 76 P.R.R. 291, 296–301 (1954), in connection with the death of a girl who was struck by a truck, the adjuster of the insurer obtained the parents' consent to a release by means of which the release from all claim was obtained through the payment of $1,000. He told them that "he was coming to bring her $1,000 because the company was not paying more and even if she [the plaintiff] went to Court she was not going to obtain more because a minor and not a head of a family had been killed." We reversed the judgment of the trial court in this case because we concluded that said release was obtained by deceit. We grounded our position on the fact that we were dealing with "a case of admitted liability in which an insurance adjuster six days after a six-year old child has been killed visits at her countryside home the mother who is virtually illiterate, tells her the court would not award her more than $1,000 because the person killed was a minor and not the head of a family, and in a few minutes, after she has consulted only her similarly untutored husband, obtains her signature in consideration of the payment of $1,000 to a release which the adjuster had prepared before he knew anything about the facts of the case." We stated that "the adjuster, who had had two years of experience in an infinite number of cases, knew that his statement [a court would not award her more than $1,000] was shockingly false; that he intended for the plaintiff to rely on his statement; and that the plaintiff —an ignorant, simple, country lady, who could not yet have felt completely normal only six days after this terrible accident—did rely on this false and fraudulent misrepresentation

and was induced thereby to accept the adjuster's offer and to sign the release."

Let us see the evidence submitted in this case, in the light of the foregoing, for the purpose of determining whether it supports the findings of the trial court.

Appellee's evidence consisted of his own testimony explaining the accident and the payment of the $1,200 and of documentary evidence consisting of a certificate of the physician who examined him which was admitted by stipulation, another from the Social Programs Administration of the Department of Agriculture of Puerto Rico where he works, granting appellee 14 days of sick leave starting on July 8, 1959 until the 24th of said month, the release from liability signed by appellee, the check he received, and the telegram he sent to Macías.

Appellee testified that he obtained the leave from his employment "Because the day after I was struck, that I had been struck, the night before, I could not get up. The blow on my chest had been so hard, really, it hurt and the blow here on the neck and on the arm, on the right and left arms, here on the shoulder, and everywhere, that I felt so sore, that I did not dare get up, and at the same time I felt, I did not feel well, I felt sick, I was bruised and the doctor had told me, since I did not want to stay the night before, the doctor wanted to place me under observation . . ."; that three days after the accident Serrano asked him to go to his garage since the adjuster was coming to see the vehicle, and "to see if we could reach an agreement"; that he went accompanied by his father; that they offered him one thousand dollars for the automobile but that he demanded $1,500; that they went to Serrano's office where the latter ". . . invited us to take some drinks, and Macías immediately gave them a drink, whiskey with ice and water, he gave drinks to each one, each one took his glass, and I told him that I could not drink because I was under medical treatment and I even showed him some

pills . . .''; that about half an hour later Macías the adjuster offered him $1,200 for the automobile "to close that accident of the car"; that "Macías addressing my father told him: 'Well Luis, that is as far as I can get and I am trying to solve this problem of the car today because I am leaving today, I have to leave today . . .' "; that upon being presented with the release document he read it; that "Upon seeing this, I was glad, and then my father came, and saw it, and told me: 'You see, there it is, it says so there, for your car, for the collision your car had,' and then my father told me: 'Sign it,' . . ."; that appellee said that ". . . 'there is something here I do not like, that is that we exempt any action or cause of action' and I told him: 'to what does this refer?' and he told me: 'That is for the accident of the car,' and the one thousand two hundred dollars what is that for?, I made it clear, and there is a witness, and I told him: 'And when I am discharged, that I am still undergoing treatment, although I am taking drinks,' and he told me: 'When they discharge you, go there, we will settle that there, sign this for the car,' and I signed it"; that on April 15, López Maldonado informed him to go to collect the check, which he did; that ". . . what I did not like was when I read on the check a clause which says herein and a break down that that was not what Macías and myself had agreed upon. . . . That which says about 'property damages' and about 'bodily injury' and I told Macías that that was not the agreement and I was not going to accept it"; that he received the check in López Maldonado's office in Ponce; that he immediately telegraphed Macías that "I request you grant me an interview since the $1,200 transaction referred according to conversation only to the value of the automobile and not to the injuries suffered and still under treatment. I signed the document on those grounds. Please let me know"; that Macías did not accept the contention made in the above-mentioned telegram; and after borrowing $1,200 from the Banco de Ponce he left the check in guarantee for

the purpose of buying another automobile; that about ten or eleven months after having received the check he cashed the same.

On cross-examination appellee testified that he was 34 years old; that since 1955 he works for the Social Programs Administration; that immediately after the accident he went to the hospital but he was not confined therein, instead he went to his house and three days afterwards he went to Serrano's garage to deal with Macías about the case; that he drank liquor at "their" request; that "they insisted so much that I had to please them." The cross-examination on this respect continued as follows:

"Q. If you are feeling sick and I tell you: 'drink that poison,' do you drink it?

A. No, I do not drink it.

Q. The fact is that you were feeling sick and you drank all that, and more than three?

A. At Macías request: 'But, oh boy, those pills won't harm you, take a drink.'

Q. You had to please him and being indulgent . . .

A. That is an experience.

Q. And your father told you: 'don't drink that?'

A. 'If you are feeling sick don't drink anything.'

Q. You were following Macías advice. Is Macías' advice more important than that of your father?

A. My father's.

Q. Wasn't it that you were not feeling so sick?

A. Macías came, and my father came and told me: 'Let me see the pills, take a drink and please him.'

Q. And once it was finished?

A. At the moment I did not feel any pain."

He testified that he signed the release "For the car, because it was so stated there", that the release as to his injuries "did not mention them"; that Macías stated "The injuries came afterwards." Questioned if he asked Macías to clarify about the injuries in the document, he answered "And he did not do it. He said that he was going to question it later, later

there." Questioned why he did not return the check, he answered that "López did not want to take it . . . then I thought; I can talk to him; I had also signed my car's license and, where was my car? I had to keep check . . ."; that they did not settle his injuries because it was known that he was under medical treatment; that after he received Macías' letter, which he read, he did not return the check either. To questions from his counsel he said that: "I could not return the check, you see, because I had to consult with some people first. I called my father and my father told me: 'Remember that he told you to wait until you were discharged and wait until I have some days off that I am going to speak to him, leave the case there, that we are going to talk with him.' And I kept the check." Questioned whether he knew how much it cost to repair his vehicle, he answered "No because I sold the car and it was lost."

Rafael Serrano, the owner of the garage where the meeting in connection with the compromise of appellee's claim was held, testified as witness for appellants. He testified that Macías, whom he knew "As the claim manager of Simonpietri," Piñero and Rodríguez, and appellee and his father were present; that they went to see the damaged automobile owned by appellee in order to determine the damages, later they went to his office where "they reached a compromise . . . a complete compromise of the case for $1,200, it included the damages to the car"; he also testified, that he is the owner of a garage and an expert in determining the damages to vehicles and the volume of his transactions with insurance companies reaches an average of fifty percent annually.

Rafael Macías López testified that he met appellee and his father together with Piñero and Rodríguez in Serrano's workshop; that "I was looking over the car and we started discussing the compromise. We moved to the office and there we finished transacting . . . a compromise for the personal damages of Carrasquillo . . . upon signing the release for $1,200

damages were included, as well as personal damages; that nothing was left pending settlement; that the reason why the sum was broken down in $100 for personal damages and $1,000 [*sic*] for damages to the vehicle is that "According to the company's regulations I had to fix an amount"; that later "After the compromise was made, Serrano gave us" some drinks. On cross-examination he denied the fact that appellee told him that he was under medical treatment; that he did not go to see appellee's physician nor did he see the latter's medical certificate during the transaction of the compromise but that later appellee sent him not the certificate but a bill which the witness paid as an attention to appellee; that the break down of the amount of the check is an internal matter of the company's office. At the close of this witness' testimony appellants announced that López Maldonado and Piñero were going to testify the same thing Macías testified. Appellee then announced that "in view of the evidence he was not going to present his father Luis Carrasquillo" because "we understand that it is not necessary."

Macías' letter to appellee, in reply to his telegram to which we have previously referred, reads that

"The telegram in question took me by surprise, from the point of view of its contents. By surprise, because I had made it very clear that the compromise for the $1,200 was for the automobile and possible injuries you might have received. Precisely that was the reason why I could not please you when you insisted that we raise our offer. Besides I told you that the compromise I was making with you meant a loss of from $200 to $300 for the Company, if we had undertaken the reparation of your automobile. However, I preferred to do it thus for the benefit of your own interests and so that our good friend was in condition for solving his transportation problem."

and that

"After having compromised the case with you, I must remind you that in the warmth of some drinks between good and distinguished friends, as a joke you said that after the first libations you felt well and that it had no importance. That you had

rather gone to the doctor to make sure that you had not suffered any serious injury.

"If you want to take back the compromise, you can do so and we pray you return the check."

The evidence shows that appellee is not an illiterate nor an ignorant person of whom they could take advantage with relative facility. He himself admits that he was aware of the nature and extent of the release he signed. Later on when he objected to the compromise through his telegram, he was given the opportunity to set aside the compromise by returning the check, but he did not do it. On the contrary, he used the same, and then he cashed it. These circumstances substantially distinguished this case from that of *Cruz, supra.*

■ The evidence shows, however, that there was not a clear and doubtless understanding about the scope of the compromise performed; that while appellee assumed that it only covered the damages of the vehicle, Macías, in accordance with the well-known established practice of the insurance companies of compromising in only one act all the damages incurred, understood that he had attained it upon obtaining appellee's signature in the printed form of the release which his secretary Rodríguez typed. We conclude, therefore, that an understanding not having been reached by the parties as to the nature and scope of the proposed compromise, the latter was not performed at law and therefore it cannot prevail.

In *Carrasquillo* v. *Superior Court, supra,* we did not decide as the trial court seems to indicate, that Macías' conduct gave rise to a cause of action. We only determined in this case that the joinder of definite parties in appellee's complaint was proper. Specifically we stated that "It should not be understood, however, that we are expressing any opinion on the sufficiency or the merits of the different causes of action alleged in the complaint in this case."

■ 2.—Assuming that Macías' conduct constituted a deceitful and fraudulent action to the point of vitiating ap-

pellee's consent to the compromise entered into, the fact is that appellee did not offer any evidence of the damages sustained as a result of said action. *Masa* v. *W.R.A.*, 96 P.R.R. 834, 851 (1969). On the other hand, the estimate of said damages at $10,000 results so excessive that it should be considered of a punitive character. In this jurisdiction it does not lie to grant damages of this nature. *Pereira* v. *I.B.E.C.*, 95 P.R.R. 28, 54 (1967) footnote 4; *Angelloz* v. *Humble Oil & Refining Co.*, 199 So. 656, 659 (La. 1940).

Although in *Miguel* v. *Hernaiz Targa & Co.*, 51 P.R.R. 568, 573 (1937), reference was made to punitive damages, the truth is that upon granting the sum of $500 for damages caused by the search of a home by virtue of a null search warrant, this court of law estimated the amount of the damages caused which appellees had to indemnify. Judgments of December 7, 1919 and of December 6, 1912 of the Supreme Court of Spain; 12 Manresa, *Comentarios al Código Civil Español* 652–653 (6th ed.); 31 Scaevola, *Código Civil* 303, 316 and 321.

3.—According to the certificate of the physician who took care of him, appellee's injuries consisted of multiple bruises and ecchymoses on the thorax, right shoulder and both arms and injury of the posterior cervical muscles, of all of which he complained during one month for which he was unable to work. The trial court estimated the amount of these damages at $3,700.00.

The evidence revealed that the day following the accident appellee requested a sick leave at his employment, not of one month, but of 14 days. He did not have to be hospitalized nor did he have to stay in bed. Three days afterwards he went and took part in the negotiation which gave rise to this litigation and days later he went to pick up the check and perform the purchase transactions of another vehicle. The damages, besides the impression which the collision necessarily caused on appellee, were actually slight bruises and

black and blue marks in several of the upper parts of the trunk and a blow on the neck muscles, without further consequences. Although these injuries might have been somewhat painful, and the pain may have taken days to disappear completely, they did not disable appellee to the point of needing hospitalization or receiving special treatment, as for example diathermy and massages or administration of some sedative or confinement in his house. Therefore, we conclude that the amount for damages is excessive and it should be reduced to the sum of $1,000.

4.—In view of the fact that the compromise which gave rise to the controversy in this case was not performed, it is proper to remand the case to the trial court in order to determine, after a previous hearing and the presentation of the proper evidence, the extent and amount of the damages caused to appellee's vehicle which the appellant insurer shall pay him.

5.—Once the amount of the damages sustained by the vehicle has been determined by the trial court, the amount of $1,200 previously paid by appellants to appellee should be deducted from the total amount of the damages to which the foregoing paragraphs 3 and 4 refer.

6.—In view of the foregoing we conclude that the amount for attorney's fees is excessive for which reason it should be reduced to the sum of $300.00.

The judgment rendered in this case on August 31, 1966 will be reversed, and another will be rendered dismissing the complaint against appellants Macías and Lippitt & Simonpietri, Inc., and ordering appellant U.S. Casualty Co. to pay $1,000 to appellee for the personal injuries he suffered and the physical and mental sufferings sustained as a result thereof, plus $300 for attorney's fees and costs, and the case will be remanded to the trial court for the purposes set forth in the foregoing paragraphs 4 and 5.

Mr. Chief Justice, Mr. Justice Hernández Matos, and Mr. Justice Blanco Lugo did not participate herein.